**Petition of CAPE FEAR, INC., FOR EXONERATION FROM OR LIMITATION OF LIABILITY, CIVIL AND MARITIME.**

**No. CIV.A. 99–11312–REK.**

United States District Court,
D. Massachusetts.

Dec. 20, 2001.

Thomas J. Muzyka, Clinton & Muzyka, Boston, MA, for Cape Fear, Inc., Owner of F/V Cape Fear, Petitioner.

Carolyn M. Latti, Latti Associates, Boston, MA, David F. Anderson, Latti & Anderson LLP, Boston, MA, for Dennis Martin, Susan Allen, Claimants.

**Opinion and Order**

KEETON, District Judge.

## TABLE OF CONTENTS

I. Introduction ........................................................230
   A. Introductory Description of the Cape Fear and Her Use ...............230
   B. The Sailing of Sister Ships .........................................231
   C. Engagement of Novack as Captain...................................231

II. The Last Voyage of the Cape Fear ......................................231
   A. The Voyage Planning................................................231
   B. Departure From New Bedford ......................................231
   C. Outbound: Steaming Down to Clamming Grounds ....................232
   D. Clamming During Cape Fear's Final Voyage .........................232
   E. Homeward Bound ...................................................244
   F. Cape Fear's Final Minutes .........................................247

III. More About the Circumstances of Case Fear's Final Voyage ...............253
   A. More of Lemieux's Testimony About Cape Fear's Final Minutes in
      General ........................................................253
   B. More of Lemieux's Testimony About Reeves' Yelling For Help ..........255
   C. More of Lemieux's Testimony About the Cape Fear and the Crew.....255
   D. More of Lemieux's Testimony About Misty Dawn .....................260

IV. Frustrating Jargon and Unwillingness or Inability of Witnesses to
    Describe .......................................................261

V. More Evidence to Support Reasoned Inferences About What Happened
    On the Final Voyage of Cape Fear ......................................261
   A. More About Cape Fear's History and Characteristics ..................261
      1. In General ....................................................261
      2. More About Clam Cages........................................263
         a. Things to Remember .......................................263
         b. More About Procedure for Loading Into Tanks.................264
         c. The Limited Practical Possibilities for Stacking Loaded
            Clam Cages on the Cape Fear................................266
      3. More About Cape Fear's Pilothouse and Vicinity ..................266
      4. More About Cape Fear's Equipment..............................267
         a. More About a Life Raft .....................................267
         b. More About Survival Suit Examination.......................268
   B. More About Stability and Seaworthiness .............................269
   C. More About Cape Fear's Crew.......................................272

      1.  In General .............................................272
      2.  More About Paul Martin .........................273
      3.  More About Steven Reeves.......................274
  D.  More About Captain Novack's Authority and Common Practice on
      Cape Fear ...............................................274
      1.  In General .............................................274
      2.  More About Log Books..........................275
      3.  More About Marketing Clams ..................276
      4.  More About Unloading and Previous Topping Off ..................276
      5.  More About Place Cards (Placards) ..............276
      6.  More About the Weather and Its Consequences.....................276
      7.  More About Safety Drills ........................276
  E.  Salvage .....................................................278

  VI.  More About Interlocking Ownership of Vessels and Shore Facilities .........278

  VII.  More About Alexander's Testimony at Trial ................................279

  VIII.  Testimony of the Expert Witnesses ......................................280
    A.  DuBois .....................................................280
    B.  Linnan .....................................................281
    C.  Clifford A. Gouley ............................................281

  IX.  The Exoneration Proceedings ...........................................282
    A.  Introduction .................................................282
    B.  Issues Regarding Alleged Unseaworthiness of the Vessel ..............282
    C.  Findings on Unseaworthiness ...................................284

  X.  Other Matters ........................................................285

ORDER ...................................................................285

## I. Introduction

### A. *Introductory Description of the Cape Fear and Her Use*

The Cape Fear was a 111–foot steel-hulled western-rig fishing vessel, dedicated to clamming. To be suitable for clamming as practiced by vessels sailing out of the port of New Bedford in the 1990s, she needed and in fact had a set of structures at the stern that included a "doghouse," "hydraulic room," an A–Frame, a "hydraulic dredge," and a door that "trips" and makes clams go into a "hopper." The function of these structures is explained in Part II.D of this Opinion, below. Cape Fear needed, and in fact had, a dredge that was 24 feet long, with a cutting bar in front that was 120 inches long. It was designed to cut into the ocean bottom and make clams run up and into the back of the dredge. *See* Part V, below, for more details.

The A–Frame structure rises to about eight feet above the deck at the stern. A winch is located about half-way up (four feet) from the deck. The hopper is just back of that winch. *See* Part V, below, for more details.

Cape Fear sailed out of the port of New Bedford for the better part of two decades before her final voyage. Her favorite grounds for operations, during the last five years before she sank in 1999, were about 14 miles southwest of the entrance to Buzzards Bay. This location was 25 to 30 miles, more or less, from the dock in New Bedford from which she would sail for a clamming trip.

Cape Fear's practice was to sail from the Sea Watch International dock in New

Bedford in the afternoon of the day of departure. A clamming trip would ordinarily be a minimum of 30 hours and might extend to as much as 60 hours, depending on how the clamming went. Cape Fear would do clamming both during night hours and through daylight hours.

## B. *The Sailing of Sister Ships*

Cape Fear had a sister ship, Misty Dawn, which likewise sailed from Sea Watch International dock in New Bedford. The sister ships often sailed together to and from their favored clamming grounds, taking maximum advantage of the developing information they reported to each other about details of their observations of weather, sea conditions, and success or failure in locating clams as the trip developed.

## C. *Engagement of Novack as Captain*

Steven Novack was first engaged as Captain of Cape Fear in 1994 though he had served as an employee of the principal owner of Cape Fear, Warren J. Alexander, in other capacities earlier. James Haley was the Relief Captain of the Cape Fear.

## II. The Last Voyage of the Cape Fear

## A. *The Voyage Planning*

Pre-voyage planning was a standard and traditional practice for vessels engaged in clamming operations, sailing out of the port of New Bedford.

No party to this civil action has made assertions or a proffer of evidence challenging the existence of this practice among clamming vessels sailing out of the port of New Bedford, or asserting that Cape Fear's practice was different.

In general, the pre-planning consisted of obtaining as much relevant information as could conveniently be obtained to inform the captain and crew about predictions of wind, weather, and sea conditions for the duration of an expected voyage. The sources used were available weather forecasts, including those every six hours on the VHF sideban, and reasonably reliable word-of-mouth reports circulating in and around the harbor.

## B. *Departure From New Bedford*

In accordance with customary practice,

On January 7, 1999, Captain Novack made the determination that the vessel should proceed and commenced prosecuting the voyage. (Transcript Page 143, Lines 23–25; Transcript Page 144, Lines 1–5).

Docket No. 77, ¶ 44.

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77),

279. On the trip commencing on January 7, 1999, the crew consisted of Captain Steven Novack, Mate James Haley, and Deckhands Paul Martin, Steven Reeves and Joseph Lemieux. (Transcript Page 5–133, Lines 8–11).

280. The normal complement of a crew of 5 was onboard the vessel on January 7, 1999. (Transcript Page 142, Lines 19–24).

281. At 1:15 p.m. on January 7, 1999, the F/V CAPE FEAR departed the Port of New Bedford for the fishing grounds. Exhibit No. 10. (Transcript Page 5–131, Lines 16–25, Transcript Page 5–132, Line 1).

282. When the F/V CAPE FEAR departed New Bedford she had onboard 130 cages. (Transcript Page 5–133, Lines 3–7).

*Id.,* ¶¶ 279–282.

The uncontested statement that Cape Fear departed with 130 clam cages onboard was not, however, the whole truth. In fact, I find that she had at least two

more clam cages aboard, as had many times been the case in 1998. *See* Part V.A.2 of this Opinion. As further explained in Part V.A.2, Captain Novack and the crew took aboard clams beyond those loaded into the cages.

Cape Fear went out on January 6, 1999 but returned that same day because of bad weather.

On Cape Fear's final voyage, Cape Fear and Misty Dawn left New Bedford on January 7, 1999. The captain (Steven Novack), the mate (James Haley, Jr.), and three deckhands (Joseph Lemieux, Jr., Paul Martin, and Steven Reeves) were the entire crew of the Cape Fear. Uncontested Claimants' Proposed Findings of Fact, Docket No. 76, page 1.

The National Weather Service forecast at the time of departure was for 25 to 30 knot winds and seas of 4 to 8 feet.

## C. *Outbound: Steaming Down to Clamming Grounds*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

284. During the outbound voyage, the deckhands slept to obtain rest before arriving at the fishing grounds. (Transcript Page 5–133, Lines 17–21). . . .

*Id.,* ¶ 284

286. A rotating schedule [for some crew members to be on deck or otherwise on watch, and others to be at rest] was arranged among the deckhands. (Transcript Page 5–178, Lines 4–7).

287. It was the custom and practice on the F/V CAPE FEAR for the one deckhand to rest while the other two worked on deck. (Transcript Page 5–177, Lines 19–25, Page 5–178, Lines 1–7).

*Id.,* ¶¶ 286–287.

On the record of documentary and testimonial accounts received in evidence, it appears to be undisputed that Cape Fear and Misty Dawn left on the outward bound leg of Cape Fear's last clamming trip on the afternoon of January 7, 1999, in time to make the 3:15 p.m. bridge opening.

The outward bound trip was described by Joseph Lemieux (Day Five, 132–134) as generally consistent with expectations of the Captain and crew at time of departure from New Bedford. It was an unremarkable outward-bound voyage of eight hours, more or less.

According to Lemieux, Cape Fear had "around three feet" of freeboard at the stern when she arrived at the clamming grounds. That was "normal." (Day Five, 134).

## D. *Clamming During Cape Fear's Final Voyage*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

59. The F/V CAPE FEAR harvests ocean quahogs by employing a hydraulic dredging system. The vessel tows behind its hull a dredge which forces hydraulic seawater into the seabed at the forward edge of the dredge. (Transcript Page 57, Lines 4–8).

60. The dredge then collects the clams and is retrieved by a winch periodically. (Transcript Page 67, Lines 9–25; Page 68, Lines 1–17).

61. As the dredge is pulled up into the A–Frame, it automatically opens and deposits the clams into a hopper. (Transcript Page 68, Lines 18–22).

62. A separator then separates the clams from other debris and places the

clams onto a fore and aft conveyor belt located on the centerline of the vessel. (Transcript Page 70, Lines 5–11).

63. As the clams move forward along the centerline, the clam tanks are loaded from forward to aft. (Transcript Page 70, Lines 14–19).

*Id.,* ¶¶ 59–63.

The dredge and winch referred to in paragraph 60 of Docket No. 77, immediately above, the hopper referred to in paragraph 61, and the conveyor belt referred to in paragraph 62 are parts of a system for moving the clams into the tanks, referred to in paragraph 63, and doing so in the order of loading the most forward tanks first, then the center tanks, and finally the aft tanks, as stated in paragraph 63. This integrated system was described in different jargon terms (*see* Part IV of this Opinion on the use of jargon generally) by different witnesses. Among the jargon terms, as confirmed by Lemieux's trial testimony (Day Five, 144, 148) were the phrases "Venturi system" and "siphoning system," associated with which were a block (or snatch block), and a J hook (Day Five, 181, 185).

From all the evidence received at trial, including documents received as exhibits and testimony received from witnesses, I find that Captain Novack and his crew customarily followed the procedure described here when clamming. I find also that they did so on Cape Fear's last clamming voyage. In this description I use their jargon (such as "pushed water" and "hauled back" clams) without further explanation except as needed to clarify meaning.

The clothing they wore on the outbound voyage was not suitable for use during clamming. Thus, just before clamming they would change clothing in order to be suitably dressed.

Then they would set out the 8–inch clam hose—through which they pushed water to the dredge from a clam pump that was located in the forward engine room.

The purpose of pushing water through the dredge is to break up sediment, so the ocean bottom at that point is looser.

The effect is that the turbulence of the water breaks the clams loose from the ocean bottom and pushes them back into the dredge.

This process ordinarily takes between 10 and 30 minutes of towing time.

Then they haul the dredge back up into the ramp, using a mechanism that pops the door open on the bottom of the dredge.

Using conveyor belts, they bring the quahogs (or clams) out of what they call the "harper" and across what they call the "shaker" to get rid of shells and other debris.

A "stack conveyor" is used on deck so the members of the crew do not have to shovel. The clams run up the deck in a forward direction, on a belt. On the sides are doors that open up to chutes that direct the clams into clam cages below deck.

The process is to fill clam cages below deck from one side to the other, back and forth.

Cape Fear ordinarily "hauled back" 10 to 30 minutes. Ordinarily, and also on Cape Fear's last trip, they would try to get two drags within an hour.

The sequence of loading is forward tanks first and then work back.

When the most forward tanks are full, they slide the hatch covers into place over the most forward tanks and then work back to fill the center tanks, then sliding the hatch covers over the center tanks, and then filling the most aft tanks.

After all the clam cages in the tanks are filled, they start up topside. If the boat lists a few degrees this way or that, they start topside opposite the list. Thus, for example, if the list is to port, they start on the starboard side.

Topside, ordinarily they would start forward, filling some cages along the rail and then some cages on the hatch covers forward. Then they would work back toward the stern.

When the whole sequence is complete, all the way aft, they disconnect the "stack conveyor" and wash down the deck.

Lemieux's trial testimony adds more explanation:

Q. Now, the block that you're talking about, all right the snatch block that you use to lead the line through, how far is that located aft of the hatch combing, that pole that you showed us?

A. Somewhere between a foot, a foot and a half.

Q. Okay. And that's behind the combing itself on either side of the port and starboard; is that correct?

A. That's behind the very end of the backing of the cover, yes.

Q. So on Exhibit 2, when you pointed to the area where the snatch block was, that's about a foot, a foot and a half behind the combing of the hatch itself; is that correct?

A. At least, yes.

Q. It could be more?

A. It could be, yes.

(Day Five, 187–188).

About the J hook, Lemieux testified:

Q. Now, this rope has a J hook on the end of it, does it not?

A. Yes.

Q. Okay. And the J hook is what connects to the hatch cover to pull the hatch cover closed or opened; is that correct?

A. Yes.

Q. And with regard to the hatch covers, there is a location at the forward end of the hatch cover and at the after end of the hatch cover that you can attach this J hook to; is that correct?

A. There's only one on each hatch.

Q. Okay. There isn't one at the forward end?

A. No.

Q. Okay. There isn't one at the back end? Is that correct too?

A. There is one placed on each hatch that you can latch to.

Q. Okay. And with regard to the third hatch, where is that, the aftermost hatch?

A. On the back of it by the stern, closest to the stern.

Q. This knot that was in the rope that you described, where was the knot located in respect to the J hook?

A. Right where it connects to the J hook. That's what held the rope to the J hook.

Q. Okay. So what happened was, instead of putting the rope through the eye in the top of the J hook and splicing it back into the rope, it was just tied back into the rope; is that correct?

A. Yes.

Q. Okay. And that knot was approximately how big in length?

A. It was probably a ball about this big. (Witness indicating.)

Q. Okay, about three inches in diameter?

A. Yes, at least that, yes.

Q. Okay. And who tied the knot in the J hook? Did you?

A.   No.

(Day Five, 185–186).

Q.   So part of the job of the deckhand is to close the hatch covers when the cages are completely filled with clams; is that correct?

A.   Yes.

(Day Five, 182).

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

55.   Mr. Lemieux recalled that two trips prior to the last trip the rope used to close the hatch covers had broken. (Transcript Page 5–139, Lines 7–10).

56.   A knot was tied attaching the J hook to the rope. (Transcript Page 5–184, Lines 19–24).

57.   The knot was too large to pass through the snatch block which was used to close the hatch covers. (Transcript Page 5–184, Lines 19–22).

Docket No. 77, ¶¶ 55–57.

According to Lemieux's trial testimony:

Q.   Mr. Lemieux, on the fishing vessel CAPE FEAR, the [aft] hatch cover[s], the stern on port and starboard, would slide underneath the [middle] hatch cover[s]; is that correct?

A.   Yes.

Q.   Okay. And was there space [on both port and starboard] between the [middle] hatch cover and the [aft] hatch cover?

A.   A small amount of space, yes.

(Day Five, 141).

Q.   Mr. Lemieux, what is your best estimate as to the amount of space between the [aft] hold cover and the [middle] hold cover?

A.   About an inch.

(Day Five, 142).

Q.   Now, sir, you mentioned that the knot was in the rope on the prior two trips?

A.   To the best of my knowledge, yes.

Q.   Okay. And did you ever make any complaint to Mr. Alexander about that knot being in the rope?

A.   To Mr. Alexander, no.

Q.   The answer is "no"?

A.   "No."

(Day Five, 197).

Q.   Now, sir, you testified that the rope that is used to pull the hatch cover closed had a knot in it; is that correct?

A.   Yes.

Q.   Did you ever see the knot?

A.   Yes.

Q.   When was the first time that you saw the knot?

A.   It was a few trips prior to that when the rope had snapped.

Q.   Okay, a few trips before the rope had snapped; is that correct?

A.   Yes. It had happened more than once.

Q.   Well, if a rope wears out, it will wear out and snap; isn't that correct?

A.   Yes.

Q.   Okay. A few trips before, the rope broke, is that correct?

A.   Yes.

(Day Five, 184–185).

Q.   In any event, you saw it two trips before?

A.   Previously to that trip, yes.

Q.   Okay. And the vessel was fishing out of New Bedford at that time?

A.   We made a trip out of Atlantic City.

Q.   Okay. And is that when you saw this knot in the rope?

A. If I remember correctly, yes.

Q. Okay. And how big is the J hook?

A. It's probably 5 or 6 inches long maybe.

Q. Okay. And the place where you connect the J hook into the [most aft] hatch cover, how far is that forward of the after end of the hatch cover?

A. It's right on the very end at the rear of the cover itself.

Q. Okay. What does it look like? Can you describe it for me?

A. It's just a thick piece of steel with a hole in it that you can run the hook through.

Q. And is that at the end of the hatch cover, the very end of it, or is it set forward from the end of the hatch cover?

A. The very end.

(Day Five, 187).

Q. Now, the vessel has on board a spare reel of rope, does it not?

A. Yes.

Q. And that was located next to the winch?

A. Yes.

Q. So if you wanted to replace that whole rope, you could have replaced it with new rope; isn't that correct?

A. Yes.

Q. The vessel also has a come-along on board; isn't that correct?

A. Yes.

Q. Could you explain to the Court what a come-along is?

A. It's a steel cable that—I mean, I don't know how I would go about explaining that. I mean...

Q. It's a chain, block, and pulley arrangement; isn't that correct?

A. Some of them are a cable, yes, more or less the same.

Q. Okay. And if you wanted to close the hatch cover the 3 to 5 inches, you could attach the come-along to where the block was and hook it into the hatch cover and close it, could you not?

. . . . .

A. It's possible, yes.

(Day Five, 190–191).

The six holds are arranged in three pairs—port and starboard holds, side by side. The practice was to fill the most forward holds first, the middle holds next, and the most aft holds last. Each hold would have 15 cages, for a total of 90 cages. (Testimony of Joseph Lemieux, Day Five, 135–136).

According to Joseph Lemieux, when Cape Fear got to the clamming grounds on her last voyage, the first thing they did was to "set out the gear." That is part of the job of the deck hands. To do that, a deck hand had to stand at the stern. (Day Five, 133–134). Deck hands also did every other thing they had to do to get ready to clam. They slid the hatch covers to "open" and got ready to put the clams into the holds as soon as the clams came off of the dredge. (Day Five, 134).

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

311. During the next three (3) to four (4) hours of loading clams [after the loading began on Cape Fear's final voyage], none of the deckhands closed [the most aft port] hatch cover. (Transcript Page 5–189, Lines 18–25).

312. The F/V CAPE FEAR was supplied with a spare reel of rope at the pilothouse and next to the winch. (Transcript Page 5–190, Lines 1–5).

313. It was also supplied with a come-along, which is a block and pulley system that may be used to close the

clam tank. (Transcript Page 5–190, Lines 9–11).

314. At no time during the fishing trip, did the deckhands utilize either the spare rope or the come-along to completely close [the most aft] port hatch cover.... (Transcript Page 5–190, Lines 18–25, Transcript Page 5–191, Lines 1–4).

315. Prior to leaving the fishing grounds, Mr. Lemieux did not measure the aft freeboard. (Transcript Page 5–192, Lines 17–24, Transcript Page 193, Lines 13–19).

Docket No. 77, ¶¶ 311–315.

317. His estimation of ten (10) inches could be wrong because of the waves.... (Transcript Page 5–194, Lines 9–15).

*Id.,* ¶ 317.

319. After loading all clam cages in the clam tanks, the clam tanks were pumped out to insure that the tanks were dry. (Transcript Page 5–144, Lines 10–15). This was a shared responsibility among the deckhands. (Transcript Page 5–144, Lines 16–18).

*Id.,* ¶ 319.

Joseph Lemieux's trial testimony described more details about "hauling back" the fishing apparatus in the following way:

Q. Now, after the CAPE FEAR was loaded with 130 cages of clams, did you participate in hauling back the fishing apparatus?

A. Yes.

Q. Okay. And where did you do that from?

A. At the stern of the boat.

Q. And while you were at the stern of the boat, was the boat traveling forward in the water?

A. No. They stopped the boat to pull the tow line in. It's a lot easier to pull in if the vessel is not moving.

Q. And who on the last trip pulled in the tow line?

A. The three deckhands, myself, Steve Reeves, and Paul Martin.

Q. Okay. And did you have an opportunity at that point in time to observe how much freeboard the CAPE FEAR had?

A. Yes.

Q. And how much freeboard did the CAPE FEAR have at that point in time when you pulled in the tow line after she was fully loaded?

A. About ten inches.

Q. Now, at some point were the clam holds pumped out?

A. Yes.

Q. Can you describe for the Court, because we haven't actually gone into that, can you describe for the Court or the Judge what I'm talking about?

A. Well, it's a Venturi system that pumps the water out of the hold through a drain in the bottom of the tank and ejects it out the side of the boat back into the ocean.

Q. Were you the one who pumped out the different clam holds?

A. That was a shared responsibility between the deckhands.

.    .    .    .    .

Q. On the last trip, how were the clam holds pumped out, if you know?

A. There was a routine that was followed, each tank separately, starting with the tanks closest to the bow and working our way back to the stern.

Q. And was that routine followed on the last trip on the CAPE FEAR?

A. Yes.

.    .    .    .    .

Q. When would the [most forward set of] clam holds be pumped out?

A. It may be pumped out maybe once during a trip while we were loading the boat, but at the end of the trip when the boat is all loaded and we're going to pull the gear, we'd pump out all the holds.

Q. Would you pump out all the holds before you pull the gear or after?

A. Usually before.

Q. With respect to the last trip of the Cape Fear, were the clam holds pumped out before you pulled the gear?

A. Yes.

. . . . .

Q. When you were hauling in the gear and observed 10 inches of freeboard, were each of the six clam holds pumped out?

A. To the best of my knowledge, yes.

Q. After you hauled the gear on the last trip—from now on, I'm going to be referring, whenever I say "vessel," I'm going to be referring to the CAPE FEAR. Whenever I say "What happened next" or "What happened then" or ask for an event, I'm going to be talking exclusively about the last trip on which the vessel sank. Do you understand that?

A. Yes.

Q. Now, after you hauled the gear, what occurred next?

A. We just picked up the shovels and totes and what not on the deck, put them aside neat, and we went into the wheelhouse.

. . . . .

Q. Was there water on the deck at the stern when you hauled the gear?

. . . . .

A. Uhm, yes, lots of times when you have a following sea, there would be water that washed up on the deck in the rear.

Q. With respect to the last trip, when you were down back at the stern hauling the gear up, was there water on the deck on that trip at that time?

A. At that point, no.

Q. Okay. What were the weather conditions?

A. Uhm, it was windy, stormy, nighttime. We had a little bit of seas.

Q. Where were the seas coming from at the point you had finished fishing?

A. Well, we had a few large waves break over the starboard side of the ship, and after that, we had a following sea, which was waves coming up onto the stern of the boat.

Q. When you said broke over the side of the boat, was that in reference to when you had started heading home or at some later point?

A. That was on the steam in.

(Day Five, 143–147).

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

322. During the trip from the fishing grounds to New Bedford, the vessel had a following sea with . . . waves washing upon the stern deck. (Transcript Page 5–147, Lines 7–11).

323. As the vessel proceeded to New Bedford, waves were breaking on the starboard quarter . . . . (Transcript Page 5–147, Lines 7–11).

Docket No. 77, ¶¶ 322–323.

326. The weather conditions continued to change and appeared to get worse as the vessel proceeded in. (Transcript Page 5–151, Lines 2–4).

327. As the vessel approached Buzzard's Bay, the crew noticed that waves were washing up on the stern, which had

happened before. (Transcript Page 151, Lines 23–25, Transcript Page 152, Lines 1–3) . . . .

*Id.*, ¶¶ 326–327.

Confirming and stating in a slightly different way some details of the foregoing description of the clamming procedure, Lemieux testified as follows, on direct examination, by claimants' attorney:

Q. And can you describe for the Court . . . how the vessel was loaded with cages down below and cages up above, just to give the Court a sense of how this worked on this particular day? And I am referring to the trip in which the vessel was lost.

.  .  .  .  .

A. Well, . . . [the clams] were run off a conveyor belt that runs up the middle of the boat down chutes in[to] each hold, fifteen cages in each hold, six holds. All the holds were filled first, and then the cages on deck were filled after that.

Q. With respect to the holds being filled, are they filled from bow working their way to the stern?

A. Yes.

(Day Five, 135).

Also confirming details of the description of the clamming procedure are facts as stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

288. When the clams were brought onboard the vessel they entered the conveyor belt and began immediately filling the cages in [the most forward clam tanks] port and starboard. (Transcript Page 5–135, Lines 9–25).

289. When topping off the clam cages the extra five (5) or six (6) shovels full raised the amount of clams approximately six (6) inches above the top of each cage. (Transcript Page 5–179, Lines 17–25, Transcript Page 5–180, Line 1).

290. When the [most forward] clam tanks were completely full, the hatch covers on the [most forward] clam tanks were closed. (Transcript Page 5–136, Lines 1–8).

291. The cages in [the middle] Number 2 port and starboard clam tanks were then filled. (Transcript Page 5–136, Lines 1–8).

292. When the clam cages in [the middle clam tanks] port and starboard were fully loaded, the hatch covers were closed. (Transcript Page 5–136, Lines 1–8).

293. After the clam cages in the [middle] tanks were completely loaded, the clam cages in the [rearmost] port and starboard clam tanks were then loaded. (Transcript Page 5–136, Lines 1–8).

294. When those cages in [the rearmost] clam tanks were completely loaded, the hatch cover on [the rearmost] starboard clam tank was fully closed. (Transcript Page 5–136, Line 22–24).

Docket No. 77, ¶¶ 288–294

296. At the time of closing [the rearmost] port hatch cover, Deckhands Reeves and Martin were on deck. (Transcript Page 5–183, Lines 22–25, Transcript Page 5–184, Lines 1–5).

297. Deckhand Lemieux was asleep and had come out on deck after all the hatch covers had been closed. (Transcript Page 5–183, Lines 19–21, Transcript Page 5–188, Lines 14–17).

298. When Mr. Lemieux came on deck, the deckhands were in the process of loading the clam cages [that were situated] on the hatch covers. (Transcript Page 184, Lines 6–10), (Transcript Page 5–189, Lines 12–17).

299. While working on deck, Mr. Lemieux observed that [the aft end of the aft port] clam tank hatch cover was

left open approximately three (3) to five (5) inches. (Transcript Page 5–139, Lines 3–6, Transcript Page 5–184, Lines 6–10).

*Id.,* ¶¶ 296–299.

305. On [the aft port] hatch cover, the location to attach the J hook to close the clam tank is at the [aft] most end of the hatch cover. (Transcript Page 5–186, Lines 4–6).

*Id.,* ¶ 305.

307. The J hook is approximately five (5) or six (6) inches long. (Transcript Page 5–187, Lines 10–11).

308. The post to which the block is attached for closing the hatch cover behind [the aft] hatch is at least one (1) to one and half (1½) feet aft of [the aft] port hatch coaming. (Transcript Page 5–187, Lines 24–25, Transcript Page 5–188, Lines 1–3).

*Id.,* ¶¶ 307–308.

Testifying at trial about what happened after the loading of clam tanks was completed, Lemieux added:

A. Then the hatches would be closed, and we'd move a stack conveyor which would run the clams off the main belt in the middle of the boat into the cages on the deck.

Q. And there were 40 cages remaining?

A. Yes.

Q. And on the trip that the vessel was lost, how were the cages loaded?

A. In the same way they were loaded every trip.

Q. And that was?

A. Six cages per side at a time until they were filled.

Q. Okay. Now, there were three deckhands on the CAPE FEAR, correct?

A. Yes.

Q. Yourself, Mr. Reeves, and Mr. Martin. And would you work shifts?

A. Yes.

(Day Five, 136).

The schedule of "shifts" or "watches" as part of the common practice aboard Cape Fear at the clamming grounds, both generally and on the last voyage in particular, was described in the trial testimony of Joseph Lemieux. The schedule provides for work time "on" and rest time "off." One may either sleep or just spend time in the galley eating and relaxing during time "off."

Lemieux testified, on examination by petitioners' attorney, that he would usually sleep on the outbound leg of the trip, so he would be rested and ready for hard work when they reached the fishing grounds. (Day Five, 177).

Q. Okay. And once you're on the fishing grounds, the deckhands start working on deck loading the cages; isn't that correct?

A. Yes, two of the three.

Q. And you rotate. One man will be resting while the other two work on deck. Isn't that correct?

A. Yes, until we get up top. Then all three are up for the top cages.

Q. Okay. So when you're loading the cages that are in the holds, two men work. When the hatch covers are all closed, three men then start loading the cages on the deck. Is that correct?

A. Yes.

Q. And with regard to your practice as a deckhand on the CAPE FEAR, you would work primarily the port side of the vessel, the left side?

A. Yes.

(Day Five, 177–178).

Joseph Lemieux testified at trial as follows:

Q. All right. And fishing commenced as soon as the vessel got to the fishing grounds; is that right?

A. Yes, as soon as the gear was set out.

Q. And the gear is the dredge that is lowered from the pilothouse; isn't that correct?

A. Yes.

Q. The crew doesn't have to do anything as far as going back and moving the dredge or anything like that as far as fishing is concerned?

A. Yes. They have to go back.

Q. And do what?

A. They have to release the hose that connects from the dredge to the ship itself, and they have to let the tow line out.

Q. That's on the first set-out; is that correct?

A. Yes.

Q. But once the vessel starts making a number of tows, this is all done automatically from the pilothouse with controls and levers; is that correct?

A. That aspect of the operation, yes.

Q. So initially the dredge has to be set out with a hose that provides water to the front of the dredge; is that correct?

A. Yes.

Q. Okay. After that, the deckhands primarily just work on deck moving clams into cages and closing hatches; is that correct?

A. Yes.

Q. Now, you testified that you were asleep at the time that the port aftermost hatch cover was closed; is that correct?

A. Yes.

Q. All right. And Mr. Martin and Mr. Reeves would have had that responsibili-ty of closing that hatch cover; is that correct?

A. Yes.

Q. Okay. And when you woke up, you said you went out on deck and you found that the after end of the hatch cover did not go all the way up to the combing and that it was about three to five inches open?

A. Yes.

Q. Now, was there anything in the combing that prevented it from going the distance, the extra three to five inches?

A. Sometimes there's debris that gets at the end, but it wouldn't keep it open that much.

Q. Okay. On the day that you saw that it was open three to five inches, was there any debris in that area that would keep it open that amount of space?

A. No.

(Day Five, 182–184).

As to what happened during and after the filling of the holds, Lemieux testified at trial, on examination by petitioner's attorney, that when the cages in the tanks are loaded, the clams are just directed by a chute into the cages. The cages do not come out of the tanks. Once the cages in a hold are completely filled, the members of the crew put five or six shovelfuls of clams on top of the cages, raising the level about eight to ten inches. (Day Five, 178–179). The examination by petitioner's attorney continued:

Q. Sir, do you remember when I took your deposition earlier in the year 2000?

A. Yes.

Q. And I asked you some questions about topping off? Do you recall that?

MS. LATTI: What page?

MR. MUZYKA: Page 98 starting at Line 5.

Q. I asked you the question, "How many clams are put into the cages?

A. Until they are full.

Q. Okay. When they are full, are they topped off in any way?

A. Yes.

Q. Or do they go into the next cage?

A. No. They are topped off.

Q. Tell me how. How are they topped off?

A. Usually with five or six coal shovels full of clams. They call it rounding off the cage.

Q. How high would that raise it above the top of the clam cage itself, the frame?

A. Probably about six inches anyway."

Q. Did I read that correctly?

A. Yes.

.        .        .        .        .

Q. Okay. When the crew members or the deckhands are on board the vessel and they finish loading one of the hatches, they close the cover; is that correct?

A. When they are done loading one of the holds, yes.

Q. I mean one of the holds. Excuse me. Is that correct?

A. Yes.

Q. And the method which the deckhands use to cover the hatches or to move the hatch [cover] is by using a winch and a rope and a pulley or a block; is that correct?

A. Yes.

Q. Okay. And the job of closing a hatch is a two-man job; is that correct?

A. One person can do it, but it takes longer.

Q. Well, if there's two deckhands on the deck, they usually do it together because it works out better?

A. Yes.

Q. Isn't that correct?

A. Yes.

(Day Five, 179–181).

Lemieux took a rest shortly before the clamming was finished and described what he observed when he came back topside in the following way:

Q. Okay, . . . you were off watch, took a rest, and then came back on watch again; is that correct?

A. Yes.

Q. Okay. At what [point] in the procedure were [they] when you came back on watch again?

A. When I came back on watch, they had started loading the top cages on the deck.

Q. Okay. And with respect to the [most aft hatch covers], did you have an opportunity to observe the position of [those hatch covers] at that point in time?

A. As we were loading the top cages, yes.

Q. Okay. And what did you observe?

A. I noticed that it was wasn't closed completely.

Q. Which hatch [cover] was not closed completely?

A. The [one over the] port side aft tank.

(Day Five, 137).

Q. And you had seen that it was open approximately 3 to 5 inches; is that correct?

A. Yes.

Q. And did you mention that to Mr. Reeves and Mr. Martin at any time?

A. I said something to the effect that you couldn't get it closed all the way.

Q. Okay, in point of fact, when you took a coffee break, you mentioned it to them that you couldn't close the hatch all the way; isn't that correct?

A. Not that I couldn't close it all the way.

Q. No, that it wasn't closed all the way?

A. Yes, I had said something to that effect.

Q. And you still had to load the 40 cages on top of the hatch covers; isn't that correct?

A. Well, they had already started, but for the most part, yes.

Q. Okay, but you had to finish them?

A. Yes. Most of them were still empty.

Q. You certainly had about three or four hours' worth of work; is that correct?

A. Yes.

Q. Now, during those three or four hours' worth of work, after you mentioned to Mr. Reeves and Mr. Martin and you were aware that this hatch was not closed, did you ever attempt to close it?

A. No.

(Day Five, 188–189).

Q. And do you know why [it wasn't closed completely]?

A. The rope that was used to close the hatch [cover] had a knot in it instead of a splice. It stopped it from going through the block all the way, the block that was used to slide the hatch [cover] into place.

.    .    .    .    .

Q. Okay. And that's the [aft] port hatch?

A. Port side aft.

Q. And where is the block that you just referred to with the pulley?

  (Witness indicating.)

Q. And the rope you indicated had a knot in it, what was that rope used and how was it used and why could it not fit through the block with a knot in it?

A. Well, usually it had a splice in it which allowed it to fit through the block all the way.

Q. Okay. And if it fit through the block all the way, what would that do to the door of the [aft] port side hatch [cover]?

.    .    .    .    .

A. It would pull it completely closed.

Q. Okay. And with a knot in it, what would occur?

A. It remained open.

Q. What's your best estimate as to the amount it remained open?

A. Three to five inches. It was open enough, I stepped across it with my foot without my foot going into it.

Q. Okay. Now, for how long had there been a knot in that rope, your best estimate?

A. Probably the two trips prior to this one and the last trip.

Q. Okay. Had you previously complained to Captain Novack regarding that?

A. We had said that it needed to be spliced.

(Day Five, 138–139).

Q. Sir, after you loaded all the clams that were on the clam cages on deck, then the vessel proceeded into port; is that correct?

A. Headed towards home, yes.

Q. When you were on the fishing grounds, you were out in the Atlantic ocean; isn't that right?

A. Yes.

(Day Five, 191).

### E. *Homeward Bound*

In the early afternoon of January 8, 1999, Cape Fear was finishing the clamming operation and preparing to start homeward. As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

267. Warren Alexander contacted the vessel at approximately 2:00 p.m. on January 8, 1999. (Transcript Page 145, Lines 16–25; Transcript Page 146, Lines 14–17).

268. He spoke with James Haley the mate and inquired as to the progress of the trip. (Transcript Page 146, Lines 1–5).

269. Mate Haley replied that there were approximately 15 more cages to fill to concluded [sic] the trip. Once filled, the vessel would proceed to port. (Transcript Page 146, Lines 18–22).

270. This conversation lasted approximately 2 to 3 minutes. (Transcript Page 146, Lines 23–24).

Docket No. 77 at ¶¶ 267–270.

It was at a short time later in the afternoon of January 8, 1999, that Cape Fear departed the clamming grounds and started steaming home toward New Bedford. Uncontested Claimants' First Proposed Findings of Fact, Docket No. 76, ¶ 18.

Captain Novack was in command, Mate Haley was in his bunk sleeping, and in the wheelhouse with Captain Novack were Reeves, Martin, and Lemieux. *Id.,* ¶ 22.

Lemieux could observe the aft port side hatch cover from the wheelhouse when he was sitting by the back window, and the aft port side hatch cover was open. *Id.,* ¶ 23.

The aft port tank was being pumped during the steam home. *Id.,* ¶ 24. But Lemieux could not see the water coming out of the port side tank because the waves were riding over the hole that emits the water back into the ocean. *Id.,* ¶ 24.

Lemieux saw that a few large waves crashed into the port side of the boat and sprayed right over the top of the "doghouse" (the opening through which a crewmember can get down into the engine room in the stern). *Id.,* ¶ 25.

As the Cape Fear was approaching New Bedford, the weather conditions got worse. The wind and seas picked up and it started to rain. *Id.,* ¶ 26.

Joseph Lemieux confirmed at trial the circumstances at the time of starting homeward on January 8, 1999.

Q. And [when in] Buzzards Bay [you were] out into the Atlantic ocean; isn't that correct?

A. Yes.

Q. And during that time, the weather was picking up; isn't that correct?

A. Yes.

Q. When you completed loading all the clam cages, what time of day was it?

A. It was dusk.

Q. And this is January, so it gets dark real early in January, more like 4:00, 4:30 or so; isn't that correct?

A. Yes.

Q. And when you were on the stern, you told us that three gentlemen, you and the other two, Mr. Martin and Mr. Reeves, pulled in on a line; is that correct?

A. Yes.

Q. And what line was that for?

A. That's the tow line, thick rope that is attached to the dredge in case the cable that pulls it breaks.

Q. It's a safety line so you can find the dredge if the cable breaks?

A. Yes.

Q. And you had brought that on board?

A. Yes.

Q. And that was your job while you were at the stern of the vessel?

A. Yes.

(Day Five, 191–192).

Q. Okay. And what did you do during the steam in?

A. Well, we all came inside to grab something the [sic] eat, take a break. We still had the hose to pull in, but we asked to wait a little while to do that, and the captain agreed. So everybody just basically sat down, they had a cigarette and, you know, a soda and dried off a little bit.

Q. At some point did you end up upstairs in the pilothouse?

A. Yes.

Q. From the pilothouse, can you observe the back deck?

A. Yes.

(Day Five, 147–148).

On the homeward-bound leg of the trip, Cape Fear was following her sister ship, Misty Dawn. The circumstances were described in Lemieux's trial testimony:

Q. Now, Mr. Anderson asked you a couple of questions about freeboard. What's your definition of freeboard?

A. The distance between the level of the deck and the water.

Q. Okay. And at that time, how were the seas running?

A. There was a little bit of a following sea.

Q. Okay, about a foot or two?

A. It's hard to say. I mean, I'm not an expert on that. I don't know how you'd measure it. I mean, it wasn't flat calm.

Q. Okay, but there was a sea running, is that correct?

A. Yes.

Q. There was also a swell burning, was there not?

A. I'm not sure I know exactly what you're trying to say.

Q. When I say sea, I'm talking about the waves that are on top of the chop. And then in addition to that you know what a swell is?

A. Yes.

Q. Okay? So you had both a swell and waves on top of the swell; isn't that correct?

A. Well, they were waves. I don't know -

Q. How high were the waves? Do you recall?

A. No, I don't.

Q. But you have a specific memory about what the freeboard was?

A. (The witness nodded affirmatively.)

Q. Did you measure it?

A. No.

Q. You're just estimating eyeballing it?

A. Yes.

.   .   .   .   .

Q. When you looked at the freeboard, that was by an eye estimate; is that correct?

A. Yes.

Q. And at that time you were not there for the purposes of determining freeboard; is that correct?

A. No.

Q. All right. And at that time, sir, the 10 inches that you're talking about is your best estimate, not an exact measurement; is that correct?

A. Yes.

Q. And that could be wrong because of the waves; isn't that correct?

A. It's possible, yes.

Q. Now, sir, at that point in time when you were on the transom of the vessel, the main deck of the vessel was out of the water at the stern; is that correct?

A. Yes.

Q. All right. And there wasn't green water coming over the stern at that time; is that correct?

A. Yes.

Q. Then the vessel started proceeding into port; is that correct?

A. Yes.

(Day Five, 192–194).

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

329. Approximately twenty (20) minutes before the vessel sank, waves were washing up on the stern and washing off .... (Transcript Page 5–152, Lines 12–16).

330. The waves came up the stern to a position about the middle of the doghouse .... (Transcript Page 5–152, Lines 20–24).

331. Approximately ten (10) minutes before the vessel sank, the waves were washing up, but were not receding off the stern .... (Transcript Page 5–152, Line 25, Transcript Page 5–153, Lines 1–3).

332. At approximately five (5) minutes before the vessel sank, the waves continued to move forward and did not recede from the vessel. (Transcript Page 5–153, Lines 4–9) ....

333. At this point in time, the vessel was on an even keel. Captain Novack realized that there was a problem with the vessel. (Transcript Page 5–153, Lines 4–13).

334. Captain Novack directed Paul Martin and Steve Reeves to proceed to the foc's'le and wake up Mate James Haley. (Transcript Page 5–155, Lines 8–13).

335. Mr. Lemieux proceeded down the pilothouse stairs after deckhands Martin and Reeves and told them to make sure that the Mate gets up, that they have a real problem. (Transcript Page 5–155, Lines 8–25, Transcript Page 5–156, Line 1).

336. Mr. Lemieux returned to the pilothouse and obtained a survival suit from under the desk. (Transcript Page 5–156, Lines 2–5).

337. At this point in time, deckhand Lemieux looked out the back pilothouse window and saw that ... water was up to the back of the [most aft] hatch covers. (Transcript Page 5–156, Lines 6–10).

338. At this time, Captain Novack ordered everybody to don their survival suits. (Transcript Page 5–156, Lines 21–24).

339. Deckhand Steven Reeves had returned to the pilothouse with a survival suit from the galley area. (Transcript Page 5–157, Lines 3–10).

340. Deckhand Joseph Lemieux commenced donning his survival suit. (Transcript Page 5–157, Lines 14–15).

Docket No. 77 at ¶¶ 329–340.

Also, Lemieux testified at trial as follows:

Q. After you had your refreshments and anything to eat, you, Mr. Reeves, and Mr. Martin went up into the pilothouse?

A. Yes.

Q. Okay. And from that time until the vessel sank was how many hours, approximately?

(Witness pausing.)

A. I can't say for sure.

Q. Was it more than one hour?

A.  I believe so, yes.

Q.  More than two?

A.  I can't say for sure.  I can't recall.

Q.  Okay. But, in any event, as the vessel was going in, you described that waves would wash over the stern and then recede; is that correct?

A.  Yes.

Q.  Okay. And for the majority of the trip up until the last half hour or so, the water kept receding off the stern; isn't that correct?

A.  Yes.

Q.  All right.  Now, the weather was also getting worse at this time; is that correct?

A.  Yes.

Q.  The seas were building, the wind was building, plus you were getting squalls of snow and rain at that time; is that correct?

A.  Yes.

Q.  And the weather was hitting the vessel from the starboard quarter or at a 45–degree angle from the starboard side;  is that correct?

A.  Yes. We had gotten hit with a few waves on the starboard side, large waves.

Q.  And you were hit with some bigger waves than what was the average wave at that time; isn't that correct?

A.  Yes.

Q.  I think you described one hit the doghouse and spray came up over the doghouse; is that correct?

A.  Yes.

Q.  While you were in the pilothouse with Mr. Reeves and Mr. Martin, you never mentioned to the captain that [the aft port] ... hatch was open, did you?

A.  I don't remember.

Q.  In point of fact, sir, nobody mentioned that.  You don't recall hearing Mr. Martin or Mr. Reeves telling the captain that the [aft] port hatch cover was open?

A.  I don't remember.

(Day Five, 195–197).

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

272.  Warren Alexander next [after the contact at approximately 2:00 p.m., Docket No. 77 at ¶ 267] contacted the vessel at approximately ten minutes to 8:00 p.m. on the evening of January 8, 1999.  (Transcript Page 147, Lines 8–17).

273.  At that time, he spoke with Captain Novack.  (Transcript Page 148, Lines 4–8).

274.  Captain Novack advised that he had fished in a new spot and that they had a good trip.  (Transcript Page 148, Lines 9–14)

275.  He also advised that he was following approximately 3 to 4 miles behind the F/V MISTY DAWN and would make the same bridge opening at approximately 9:00 p.m. (Transcript Page 148, Lines 9–14).

276.  Captain Novack did not complain about any condition or any crewmember  .... (Transcript Page 148, Lines 17–22).

277.  Captain Novack advised that he believed that the weather was 20 to 25 knots from the southeast.  (Transcript Page 149, Lines 1–6).

278.  He anticipated being at the bridge at approximately 8:45 p.m. and arriving at the dock about 9:05 to 9:10 p.m. that evening.  (Transcript Page 149, Lines 20–25; Transcript Page 150, Lines 1–7).

Docket No. 77 at ¶¶ 272–278.

**F.  *Cape Fear's Final Minutes***

About 20 minutes before the Cape Fear sank, the waves from the following sea

were washing up the stern to the position of the doghouse, and then washing off the stern. Claimants' Proposed Uncontested Findings of Facts, Docket No. 76, ¶ 27.

Ten minutes later, the waves were washing up the deck in the stern but were not fully receding off the stern. *Id.*, ¶ 28.

Five minutes later, the seas were washing up into the work deck in the stern and not receding. *Id.*, ¶ 29.

The vessel was not tilting to one side or the other; it was settling down on an even keel. *Id.*, ¶ 30.

Several minutes before the Cape Fear rolled, Captain Novack observed that the seas were washing over the stern and not receding. He realized they had a serious problem, and he ordered the crew to wake up the mate Haley. *Id.*, ¶ 31.

Paul Martin and Steven Reeves went down to wake up Haley. While they were below, doing so, the seas continued to wash farther up the work deck, did not recede, and were washing up to the rear of the aft hatch covers, port and starboard. *Id.*, ¶ 32.

At this point, Captain Novack ordered the crew to don their survival suits. *Id.*, ¶ 33.

As Lemieux was donning his survival suit, the seas were coming farther up the aft hatch covers toward the bow of the Cape Fear. The aft edge of each hatch cover (port and starboard) was completely submerged. *Id.*, ¶ 36.

The Cape Fear started to list to port. *Id.*, ¶ 37.

Captain Novack ordered the crew to abandon ship. Reeves and Lemieux were at this time in the wheelhouse. *Id.*, ¶ 38.

40. After receiving the order to abandon ship, Lemieux walked out of the wheelhouse and over to the starboard side of the vessel. While Lem-

ieux was outside the wheelhouse the vessel was listing to port and water was covering the entire work deck from the [middle] port and starboard hatch to the stern. Trans. 5–159–161. Trans. 5–160.

41. Capt. Novack exited wheelhouse with his survival suit up to his waist but was able to pull it over his torso prior to entering the water. Trans. 5–161.

*Id.*, ¶¶ 40–41.

43. As Novack, Lemieux and Reeves were preparing to jump overboard from the wheelhouse deck, the vessel rolled to port. Mr. Reeves slid down the starboard hull with survival suit over his hips and legs. Trans. 5–174.

*Id.*, ¶ 43.

46. Approximately four to five minutes elapsed from the time Captain Novack ordered the crew to wake up the mate until the time the vessel rolled over. Trans. 5–164.

*Id.*, ¶ 46.

Confirming this sequence is a set of Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

341. As [Lemieux] was donning his survival suit, Mr. Lemieux observed water .... (Transcript Page 5–157, Lines 21–25).... water was now on top of the hatch covers and proceeding forward. (Transcript Page 5–158, Lines 1–8).

342. Mr. Lemieux donned his survival suit ... [taking] one (1) to one and a half (1½) minutes. (Transcript Page 5–201, Lines 16–24).

343. He had no problems zipping up the front his [sic] survival suit. (Transcript Page 5–202, Lines 13–15).

344. He claims he was never instructed how to don the survival suit .... (Transcript Page 5–202, Lines 19–22).

345. The vessel began to list to the port. (Transcript Page 5–158, Lines 9–13).

346. At this point, Captain Novack gave the Order to abandon ship and ordered everyone out of the pilothouse. (Transcript Page 5–158, Lines 14–16).

*Id.,* ¶¶ 341–346.

348. After giving the order to abandon ship, Captain Novack and Deckhands Reeves and Lemieux exited the pilothouse through the after door and proceeded to the starboard side of the vessel. (Transcript Page 5–159, Lines 11–16).

349. When Mr. Reeves exited the pilothouse to abandon ship, he had his survival suit half way on up to his waist. (Transcript Page 5–204, Lines 22–25).

*Id.,* ¶¶ 348–349.

353. At this point in time, Captain Novack and Steven Reeves slid down the starboard shell of the vessel. (Transcript Page 5–161, Lines 10–16).

354. As Mr. Lemieux was preparing to slide down the vessel's starboard side, the vessel capsized to port . . . . (Transcript Page 5–162, Lines 11–19).

*Id.,* ¶¶ 353–354.

356. While in the water, Mate Haley collected a wooden board and paddled to Mr. Lemieux. (Transcript Page 5–165, Lines 1–17).

357. Both crewmembers then paddled to Captain Novack after hearing his screams. (Transcript Page 5–165, Lines 18–25).

358. When they arrived at Captain Novack, Mate Haley assisted captain Novack in completely zipping his survival suit and pulling the hood over his head. (Transcript Page 5–166, Lines 1–20).

359. While in the water Mate Haley's strobe light was functioning prop-

erly. (Transcript Page 5–169, Lines 3–7).

360. While in the water Mr. Lemieux heard Mr. Reeves yelling. (Transcript Page 5–207, Lines 16–22). He was yelling "somebody help me", or words to that effect of "help" or "help me." (Transcript Page 5–207, Lines 20–22; Transcript Page 5–208, Lines 1–8).

*Id.,* ¶¶ 356–360.

Joseph Lemieux's trial testimony confirmed and added explanation of the foregoing facts about the final minutes of Cape Fear's last voyage.

Counsel for the opposing parties chose to ask Lemieux at trial to tell his version of Cape Fear's final voyage repeatedly, also seeking either to confirm or to impeach things he had said at various times before trial. The phrasing Lemieux used, or interrogators used and may (or may not, depending on your interpretation) have persuaded Lemieux to adopt, varied enough to raise problems of interpretation. For that reason, I recite here more of the repetitious testimony than would ordinarily be appropriate for inclusion in a judge's Opinion.

Q. Okay. Sir, approximately five minutes before the vessel sank, Mr. Captain Novack directed Mr. Martin and Mr. Reeves to go wake up Mr. Haley; is that correct? Is that correct?

A. Yes.

Q. And they went down the stairway in the pilothouse; is that correct?

A. Yes.

Q. And that's about a 12– to 14–foot step stairway?

A. About 12–foot, yes.

Q. And then at that time you followed them down to make sure that everybody was getting up and that you were in a

hurry to get things done; isn't that correct?

A. Right after that, yes.

Q. All right. And when you came back to the pilothouse, it was about four or five minutes until the vessel capsized; is that correct?

A. Yes.

Q. Now, when you came back to the pilothouse, Captain Novack told you to put on a survival suit; isn't that right?

A. Yes.

Q. Okay. And where did you obtain that survival suit?

A. That was in the wheelhouse.

Q. Okay, where in the wheelhouse?

A. Under the desk.

Q. And you obtained it by yourself? Nobody helped you?

A. No.

Q. You grabbed the survival suit. And it has a covering on it, doesn't it?

A. Yes.

Q. And you removed it from the covering or the cover that was on it?

A. Yes, once I figured out how to get it open, yes.

Q. Okay. And you started putting it on; is that correct?

A. Yes.

Q. And you got that survival suit on in less than a minute and a half; isn't that correct?

A. I can't say.

Q. Would you go to Page 141, Line 21. Again when I took your deposition I asked you this question, sir: "Question: How long did it take you to get into your survival suit?" And your answer was: "Once I got it out of the bag and got my boots off, not long at all, maybe a minute, minute and a half."

Did I read that correctly?

A. Yes.

Q. So you had no problem getting that survival suit on, did you?

A. Well, I had a problem getting it out of the bag, and I didn't know how to close the neck on it.

Q. What was the problem getting it out of the bag?

A. I couldn't figure out how to get it out of the bag at first.

Q. Okay. But, in any event, you got it out, and once you got it out and once you put it on, you did it in less than a minute and a half?

A. Yes.

Q. And in point of fact, sir, you had no problems zippering it up, did you?

A. No.

Q. Other than the neck covering, you were able to put the entire suit on, including the hood, without any problem?

A. Yes.

Q. Now, during the previous time that you were on board the vessel, Captain Novack would instruct you as to how to put survival suits on, would he not?

A. He never instructed me how to put one on, no.

Q. Okay, so what you're saying to us is that on this occasion in the circumstances of the vessel's sinking, that you were able to put a survival suit on, with never having practiced it or being taught how to do it, in less than a minute and a half?

A. Yes.

Q. Who told you that you had to take your boots off before putting the survival suit on?

A. One of the guys I fished with before had mentioned it when we were talking one day.

Q. In fact, isn't it true, sir, that Captain Novack told you that?

A. It may or may not have been.

(Day Five, 199–203).

Q. During the steam home—you mentioned the siphon systems that move through each of the six compartments. During the steam home, was one of the compartments being pumped out?

A. Yes.

Q. Which one?

A. The port aft.

Q. And that was the compartment in which the hatch cover was slightly open?

A. Yes.

Q. Where does that pump discharge?

A. Off the port side of the boat near the stern.

Q. And can you observe in general, just in general, if that pump is pumping, can you see the water pump out from the wheelhouse?

A. From the wheelhouse?

Q. Yes.

A. Yes.

Q. Okay. On the night while you guys are heading home on the last trip, could you observe the water coming out of that discharge?

MR. MUZYKA: You mean him?

Q. I mean you.

A. No.

Q. Do you know why not?

A. Because the waves were riding over the hole that emits the water out back into the ocean. It was below the waterline.

Q. Okay. Now, you mentioned some seas which you had taken over the starboard side. Can you describe for the Court, was that something you observed while you were in the pilothouse?

A. Yes.

Q. Can you describe for the Court what you observed?

A. We had a few large waves crash into the side of the boat and crest over the doghouse.

Q. When you say the doghouse, what are you referring to?

A. The opening to get down in the engine room in the stern.

Q. All right, I show you Exhibit No. 4. Can you just quickly identify for the Court what you're referring to as the doghouse?

A. It would be right here, the square box.

Q. It's kind of like a closet with a staircase inside it?

A. Yes.

Q. And you said waves cresting over. Would they go over the top? Did you actually mean over?

A. They broke against it and sprayed right up over it.

Q. Did the waves also break on the hatch covers?

.    .    .    .    .

A. There was water that visibly came over the rail on the skirt.

Q. Okay. And would those waves wash onto the hatch covers?

A. Usually the cages, you know, break them so that the water just runs straight down into that waste, which is lower than the hatch covers, and it just runs out the scupper holes on the side.

Q. Okay. Did the weather conditions change as you were approaching New Bedford?

A. They seemed to get worse, to me.

Q. Okay, how did they get worse?

A. Well, it seemed that the wind had picked up, and it started raining. Like I said, the seas seemed to pick up some.

Q. Who was on the wheel watch? Who was in command of the vessel during the steam home?

A. It was the captain, Steve Novack.

Q. Where was the mate?

A. The mate was in his bunk in the bunk room sleeping.

Q. Were the other members of the crew awake and in the pilothouse?

A. Yes.

.    .    .    .    .

Q. Can you describe what occurred as you approached Buzzards Bay?

A. We noticed that there were waves washing up on the stern, which had happened before. It wasn't really that unusual in seas like we were in. Usually they wash up onto the deck and wash back off.

Q. How far up the deck would they usually wash? This would be when you would be loaded or unloaded?

A. Loaded.

.    .    .    .    .

Q. On the night in question, how far— let's start 20 minutes before the vessel sank, okay? Twenty minutes before the vessel sank, had you been observing waves washing up the stern?

A. Washing on and off like normal, yes.

Q. Okay. And where were the waves coming from, what direction, if you know?

A. They were coming up over the stern.

Q. Okay. And how far up would they wash? Using this blowup of Exhibit 5, how far up would they wash? Let me hold it up.

A. Wash probably up to right around maybe the middle of the doghouse.

Q. Now, going ten minutes before the vessel sank, did the situation change?

A. They were still washing up, but they weren't receding off the stern of the boat.

Q. Now, can you describe for me what you observed five minutes before you ended up in the water?

A. Well, the water kept coming up onto the stern more and more because the rear of the boat just kind of sat down in the water like somebody was pushing down on the stern, and at that point the captain realized that we had a real problem—

Q. Let me just stop you. When you said it was like someone pushing on the stern, did you observe the boat tilting to one side or the other, or was it even?

A. No. It was on an even keel.

Q. Okay. And did you personally observe this?

A. Yes.

Q. After having observed this, did the captain say something?

A. Yes. . . . He wanted us to go down and wake the mate up and let him know that we had a real problem developing.

Q. And at that point in time, can you show on that big blowup where the waves were washing up to?

A. They were just about right up to the rear of the hatch covers.

.    .    .    .    .

Q. What did you mean by that's where they were?

A. As they stopped receding off the rear of the boat, it seemed like they were just coming up more and more towards the hatches.

.    .    .    .    .

Q. Did the waves wash up on the deck?

A. Yes.

Q. Did they roll back?

A. Yes.

Q. Did they stop rolling back after a certain point on the deck?

A. Yes.

Q. Where was that point five minutes before the vessel sank?

A. Right about where they were washing up to, they just stopped receding off the rear of the deck.

Q. Okay. And was that when you went down to wake up the mate?

A. Yes.

Q. Okay. Did you wake him up?

A. Paul Martin and Steve Reeves went downstairs to wake him up.

Q. What did you do?

A. In the few minutes it took them to go downstairs to start waking him up, the water kept coming forward onto the stern of the boat.

Q. Using that diagram, can you show the Court what you're talking about and where the water was coming to?

A. It started here, and then it just started coming forward and not receding at that point. At that point I ran downstairs to the bottom of the stairs myself and yelled to Steve and Paul and Buck. I told Steve and Paul, "Make sure he gets up now. We have a real problem," because in the little time it took them to go downstairs, it got that much worse.

Q. Did you grab a survival suit?

A. When I came back up in the wheelhouse, yes.

Q. Where did you grab the survival suit from?

A. It was under the desk in the wheelhouse.

Q. When you came back up the stairs, did you look out the back window?

A. Yes.

Q. What did you observe?

A. The water was up to the hatch covers.

Q. Can you show the Court what you're talking about?

A. The water was up to the back of the hatch covers here.

MR. MUZYKA: Which hatch covers are you pointing to?

(Witness indicating.)

MR. MUZYKA: Back of the [most aft] hatch covers?

THE WITNESS: Yes.

Q. Are you referring to solid water, or are you referring to waves?

A. At this point, solid water.

Q. And that was at the point at which you started putting on your survival suit?

A. Yes. At that point the captain had said, "Everybody get in their survival suits."

(Day Five, 148–156).

### III. More About the Circumstances of Cape Fear's Final Voyage

#### A. *More of Lemieux's Testimony About Cape Fear's Final Minutes in General*

Here I recite still more of the attorneys' extensive and repetitive questioning of Lemieux at trial. A reader may choose to skip this section of this Opinion without losing track of any key elements of the story of Cape Fear's final voyage.

At one point during trial, Joseph Lemieux's trial testimony describes Cape Fear's final minutes in the following way:

Q. Now, sir, you told us that Captain Novack was putting on his survival suit and also making a radio call to the MISTY DAWN; is that correct?

A. Yes.

Q. I think you said it was another vessel up ahead, but it was the MISTY DAWN, wasn't it?

A. Yes.

Q. And he was trying to put his survival suit on and do the radio call at the same time; isn't that correct?

A. Yes.

Q. And because he was trying to do two things at the same time, he didn't get his survival suit completely put on; is that right?

A. Yes.

Q. And at this point the vessel is now beginning to list to port; isn't that correct?

A. Yes.

Q. Because Mr. Reeves is trying to put his survival suit on, but he only got it up to the point where his legs were in the survival suit; is that correct?

A. Yes.

Q. And when the three of you left the pilothouse, you had to walk almost uphill to get to the starboard side because the vessel was already beginning to go over?

A. Yes.

Q. Now, the three of you were rushing to get to the starboard side, were you not?

A. Yes.

Q. And you were more interested in getting to the starboard side so you could get away from the vessel than about any other circumstances on deck; is that correct?

A. Yes.

Q. And at this time when you were going up the back of the pilothouse to the starboard side, you weren't paying attention to where the water was on the deck, were you?

A. Well, when you open the door to come out, you look. I mean, it's right there.

Q. Okay, but you weren't taking detailed observations of where it was in relation to hatch covers and things of that nature, were you?

A. I saw where it was. I didn't stand there and stare at it, if that's what you mean.

Q. You were in a hurry to get to the starboard side to get off?

A. Yes.

Q. Now, sir, after you ended up in the water, were you able to connect your neck cover on the survival suit?

A. No.

Q. You never connected that at all?

A. No.

Q. When Captain Novack and Mr. Reeves were ahead of you going up the deck, did they say anything to you? Do you know what I'm talking about?

A. The captain said we had to get away from the ship.

Q. Okay, but other than that, did Mr. Reeves say anything to you?

A. I don't remember.

Q. Okay. Mr. Reeves and Captain Novack slide down the side of the ship, and you get thrown in the opposite direction; is that correct?

A. Yes.

Q. At some point in time after Mr. Haley gets to you with the board, you then get to Captain Novack, and Mr. Haley zips up Captain Novack's survival suit; is that correct?

A. Yes.

Q. Did you see him actually do that?

A. He was right alongside of me when he did it.

Q. Okay, and he just pulled on the zipper, and it went straight up?

A. No, it didn't just go right up.

Q. When he pulled it, it went up, did it not?

A. Yes, he got it zipped up, yes.

Q. And he also pulled the hood on him; is that correct?

A. Yes.

Q. Now, when you were in the water, you described a period of hearing screams from Mr. Reeves; is that correct?

A. Yes. Everybody was yelling at first.

Q. Okay. And I believe, based on the way the question was presented to you by Mr. Anderson, you said that it was about ten minutes of hearing screams from Mr. Reeves?

A. It was ten minutes from the point of being in the water until -

Q. Okay. How long was it when you started hearing him scream to the time he stopped screaming?

A. Well, I couldn't tell who was who at first when I was in the water.

Q. Okay. When you were with Captain Novack and Mr. Haley holding onto the board, you heard Mr. Reeves scream? Isn't that true?

A. Yes.

Q. Okay. And what you heard was him yelling "Help, help me," isn't that correct?

A. Yes.

Q. You didn't hear him say anything about his survival suit, did you?

A. I believe he did.

(Day Five, 204–207).

## B. *More of Lemieux's Testimony About Reeves' Yelling For Help*

Q. Again, when I asked you some questions, Page 149, Line 21, I asked you this question: "When you heard Stevie yelling for help, did you understand what he was saying?

Answer: Yes. He was yelling for help, 'Somebody help me.'

Question: Just yelling the words 'Help' or 'Help me' or something like that?

Answer: Yes."

Did I read that correctly?

A. Yes.

Q. And how long did you hear Mr. Reeves continue to yell from the time you ascertained it was him until the time he stopped yelling?

A. It was a couple minutes.

Q. Okay. And when you say a couple of minutes, about two minutes?

A. Yes.

Q. In fact, sir, I asked you a question on Page 150, Line 4: "How long did you hear Stevie yelling?" And your answer was: "Maybe a couple of minutes, if that, not even, you know, by the time we got Novack together with us." Did I read that correctly?

MR. ANDERSON: Your Honor, I'd ask that the next question and answer be read for continuity purposes.

MR. MUZYKA: Sure.

Q. "Question: How long was it from the time you went into the water until the time that you got to Novack? I'm just asking for an estimate. I'm not asking for your exact time.

Answer: Fifteen, twenty minutes."

Did I read that correctly?

A. Yes.

(Day Five, 204–209).

## C. *More of Lemieux's Testimony About the Cape Fear and the Crew*

Q. At that point in time, was the boat rocking one side or falling on one side, or was it steady?

A. It was still pretty steady at that point.

Q. What happened next?

A. Steve Reeves grabbed one of the survival suits from down in the galley entrance and came up stairs into the wheelhouse with us. The captain was on the radio calling another one of our boats that was a mile or so ahead of us to turn around and check on us because we were having—taking on water. And the mate and Paul Martin stayed down in the galley and were getting into their suits.

Q. And is there a door that exits that you can get outside of the boat from the galley?

A. Yes.

Q. What were you doing?

A. I was trying to get into my survival suit.

Q. Prior to this point in your life, had you ever put on a survival suit before?

A. No.

Q. Were you able to get it on?

A. Yes.

Q. While you were putting it on, did you look out the back window of the pilothouse?

A. Yes.

Q. What did you observe?

A. That the water was coming up the hatch covers.

.      .      .      .      .

Q. At this point in time, was the vessel rolling to port, was it steady, was it rolling to starboard?

A. It started to list to the port.

Q. What do you mean by "list"?

A. It started to lean over.

Q. What occurred next?

A. At that point the captain said that we were going to have to abandon ship and for everybody to get outside.

Q. Who was in the pilothouse when he said that?

A. The captain, myself, and Steve Reeves.

.      .      .      .      .

Q. Could you see Mr. Martin or Mr. Haley from the pilothouse?

A. No.

Q. Could you see them looking out the back deck window?

A. No.

Q. Could you see them looking out any of the windows in the pilothouse?

A. I couldn't see them at all.

Q. Okay. Where were they and what were they doing when you last observed Mr. Haley and Mr. Martin?

A. They were downstairs grabbing survival suits in the galley.

Q. After Captain Novack told you and Mr. Reeves that you were going to have to abandon ship and to go outside, what did you do?

A. We opened the door, walked out behind the wheelhouse and walked over to the starboard side of the ship, and at that point the boat started listing heavily to port.

Q. Now, when you walked out the back door of the pilothouse, did you observe the back deck?

A. I could see water all across the deck.

Q. Let me just stop you one second. This is nighttime, correct?

A. Yes.

Q. And it was snowing?

A. There was snow squalls that night, yes.

Q. How were you able to see the back deck if it's dark out?

A. They have large like halogen lights, like streetlights type of lights that light up the whole deck so we can see and work at night.

Q. And when you walk out of the back of the pilothouse door while you were abandoning ship, what did you observe on the back deck?

A. That the water was still coming up the hatches.

Q. How far up, again using that big diagram?

A. Up by the second set of hatches here.

. . . . .

Q. What do you mean when you say the water was up to the second hatch?

A. There was water covering the whole deck.

Q. The entire deck or the entire deck from the second hatch back?

A. From the second hatch back.

Q. Okay. So you walk out the pilothouse door. You turned to which side?

A. To the starboard side of the ship.

Q. What happened next?

A. The three of us got on the side of the wheelhouse, and at that point Captain Novack was still trying to get his suit on fully because he had only had it on up to his waist because he couldn't operate the radio while he was calling with his suit on. And Steve Reeves only had his legs in his. And at that point the captain said, "We have to get off the ship. We have to get off the ship."

Q. When you walked out of the back door of the pilothouse abandoning ship, what was the position of the ship port to starboard?

A. It was listing enough to the point where the captain and Steve Reeves got up on the railing on the side of the boat and went to jump off, and they slid down the bow of the boat like it was a slide.

Q. Was that when you walked out the door or when you actually jumped overboard?

A. When they actually jumped over but—

Q. What about when you walked out the door, first walked out the door, had the boat rolled yet?

A. It was slowly listing over.

Q. Okay. Where were you relative— you mentioned that the boat rolled, correct?

A. Yes.

Q. And Mr. Novack and Mr. Reeves slid down the boat?

A. Yes.

Q. Okay, where were you when the boat rolled?

A. I was still at the railing that they had climbed onto to slide down.

Q. Were they in front of you?

A. Yes. There was only room enough for two people because of so many cables and, like, barrels full of cleaner and stuff like that that were tied to the railing. They were worried they didn't want to get hung up in something.

Q. Did you follow Captain Novack and Mr. Reeves off the boat?

A. As I climbed on the railing to slide down after them, at that point the boat rolled completely over.

Q. Did you end up in the opposite side of the boat from them?

A. Yes.

Q. In the water?

A. Yes.

Q. What was the condition of your survival suit at that point in time?

A. It started filling up with water.

Q. Okay. Was it completely closed?

A. No.

Q. What part of it was open?

A. I didn't know how to fasten the neck on it, so every time a wave came

over me, it filled up more and more with water.

Q. Let me stop you for a second. At that time did you have any ability to swim?

A. No. I can't swim.

Q. Describe what you observed when you hit the water, what happened when you hit the water. You mentioned you got water down in your—was your hood on?

A. Yes.

Q. You hit the water. You have your hood on. Your neck was not closed, correct?

A. Yes.

Q. And why did you not close your neck?

A. I didn't know how to fasten it.

Q. What happened next?

A. I heard people yelling in the water, and I was just trying to stay afloat myself. Like I said, I kept having waves wash over me.

Q. Let me just stop you there and go back to one issue. From the time you first observed the water coming up onto the stern of the CAPE FEAR but not receding, the point in time in which Captain Novack told crew members to go down and wake up the mate, until the time you hit the water, what is your best estimate as to how much time it was?

A. At most, five minutes.

Q. Can you be more precise?

A. In my best estimate, four to five minutes.

Q. Okay. So you were in the water and you heard some screams. What occurred next?

A. I heard someone closer to me than anybody else. I felt around on the suit for either a strobe or anything on it.

There was a whistle on it. I tried blowing that, but I could yell louder.

Q. Well, did your suit have a strobe on it?

A. Not that I know of. I didn't feel one on there and I didn't find one.

Q. Did it have a flashlight?

A. It had a whistle.

Q. Did it have a flashlight?

A. No.

Q. Did you blow the whistle?

A. Yes.

Q. Did you yell?

A. Yes.

Q. What occurred next?

A. There was someone that was yelling next to me. That was the mate, James Haley.

Q. Did you recognize his voice?

A. As he got closer to me, yes.

Q. Could you observe him visually getting closer to you?

A. No. The waves were too up and down.

Q. Did he approach you?

A. Yes.

Q. What happened next?

A. He had found a board that floated up, and he told me just to stay calm, and that he had a board for me to hold onto and that he was going to come over to me.

Q. And did he?

A. Yes.

Q. And did he bring his board with him?

A. Yes.

Q. And what occurred next?

A. He got up to me. I grabbed onto the board with him, and he started swimming towards the next closest person that we could hear.

Q. Could you see this person?

A. No.

Q. Could you hear him?

A. Yes.

Q. Did you approach this person—

A. Yes.

Q. —with the board and Mr. Haley?

A. Yes.

Q. Who was that person?

A. That was the captain, Steve Novack.

Q. And was Mr. Novack—did you observe Mr. Novack having problems?

A. Yes.

Q. What problems was he having?

A. He couldn't get his hood on, and he couldn't get the zipper to zip it up on his suit.

Q. Did Mr. Haley provide assistance to him?

A. Yes, he did.

Q. How did he do that?

A. He swam over to him and pulled his hood up on him and pulled his zipper up for him.

Q. And did you continue to—did Mr. Haley secure your neck opening?

A. No.

Q. After Mr. Haley was able to close Captain Novack's survival suit, did you continue to hear voices?

A. Yes, one.

Q. Did you recognize that voice?

A. Yes. It was Steve Reeves.

Q. And what did you hear him say?

A. He was yelling for help.

Q. Do you remember what he said?

A. He was saying, "Please, somebody help me."

.    .    .    .    .

Q. What was he indicating to you, if anything?

A. He yelled that he couldn't get [his survival suit] on.

Q. How long did you hear—from the time the vessel rolled, how long until the time you last—at some point did you stop hearing words from Mr. Reeves?

A. Yes.

Q. Did the three of you look for Mr. Reeves?

A. Yes. We yelled for him, and we were trying to swim in that direction that we had heard him last.

Q. Could you see any light, a strobe light or a flashlight which Mr. Reeves had with him?

A. No.

Q. At some point did you stop hearing words from Mr. Reeves?

A. I'm sorry, could you repeat the question?

Q. Yes. At some point did you stop hearing Mr. Reeves crying for help?

A. Yes.

Q. Approximately how long after the vessel rolled over did you stop hearing, in terms of minutes, did you stop hearing Mr. Reeves crying for help?

A. Probably about ten minutes.

Q. Did you observe a life raft in the water after the vessel sank?

A. No.

Q. Did you observe an EPIRB?

A. No.

Q. Do you understand what I mean by an EPIRB?

A. Yes.

Q. Prior to the vessel sinking, at any point prior to the vessel sinking, had you had an opportunity to observe how the EPIRB was attached to the fishing vessel CAPE FEAR?

A. To the best of my knowledge, it was clamped.

Q. Do you know anything other than that?

A. No.

Q. Okay. Now, do you know where it was clamped?

A. On top of the wheelhouse next to the life raft.

Q. Okay. Now, do you know if Captain Novack had a strobe light or a flashlight attached to his survival suit?

A. Yes, he did.

Q. Do you know if it was functioning?

A. It wasn't.

Q. How do you know that?

A. Because he tried it and it didn't work.

Q. We talked about your flashlight or strobe light. What about Mr. Haley, did he have a strobe light?

A. Yes.

Q. Was it functioning?

A. Yes.

(Day Five, 156–169).

## D. *More of Lemieux's Testimony About Misty Dawn*

Q. At some point did you hear the engines of another vessel or observe another vessel?

A. I heard it, yes.

Q. What vessel was that?

A. That was the MISTY DAWN, the boat that was ahead of us that we had called.

Q. And at that point in time were the three, Captain Novack, Mr. Haley, and yourself, still with this board?

A. Yes.

Q. And what did you guys do once you became aware that the MISTY DAWN was looking for you?

A. The mate held the strobe up and we yelled.

Q. And once the mate raised his strobe and yelled, what occurred with respect to MISTY DAWN?

A. They spotted us and came up near us, threw us a life ring, and pulled us into the side of the boat.

Q. Once you got aboard the MISTY DAWN, did you look for—once you were on board the MISTY DAWN, what did you do, if anything?

A. We took our suits off, and they gave us some blankets and stuff to try to warm us up.

Q. Did you yourself participate in the search for Mr. Martin or Mr. Reeves personally?

A. We went up in the wheelhouse and were looking out. The boat stayed there looking for them.

Q. The MISTY DAWN did?

A. Yes.

Q. And did you observe any strobe lights in the water personally?

A. There was one.

Q. Did you guys come to it?

A. Yes.

Q. Do you know what it was from?

A. It was attached to a life ring.

Q. Life ring?

A. Yes.

Q. That's the one you talked about earlier today?

A. It may or may not have been. There was more than one on the boat.

Q. Okay. Other than that one strobe attached to a life ring, did you observe any other strobes in the water?

A. No.

Q. Did you observe any flashlights in the water?

A. No.

Q. Did you observe any reflective tape in the water?

A. No.

Q. Did the MISTY DAWN have a search light?

A. They had a lot of lights on the boat. I don't know if you'd call it a search light or not, but...

Q. A light that they were able to shine out into the water?

A. Well, they had different lights on it that light up when you pull into the dock and stuff like that. Those were all lit that aim into the water.

Q. During the search for Mr. Reeves and Mr. Martin, did you observe a life raft anywhere?

A. No.

Q. Did you observe an EPIRB anywhere?

A. No.

Q. What's your best estimate as to how long the MISTY DAWN continued to search in the vicinity of the CAPE FEAR? Just a rough estimate.

A. Probably another half hour, 45 minutes.

Q. At some point did other vessels come along?

A. Yes.

Q. And they brought you folks back to New Bedford?

A. Yes. The MISTY DAWN started taking on water also.

Q. That was when she struck the CAPE FEAR?

A. Yes.

Q. You gave testimony at the Coast Guard hearing?

A. Yes.

Q. And do you know if Mr. Haley's life suit was his or belonged to the CAPE FEAR?

A. I don't know.

(Day Five, 169–172).

## IV. Frustrating Jargon and Unwillingness or Inability of Witnesses to Describe

One who reads the record of these exoneration proceedings, whether familiar with seamen's jargon or not, will be frustrated by the inability or unwillingness of witnesses (both the seamen themselves and the experts called by the parties) to give a straightforward and understandable description in plain English of the arrangement of decks and holds and clam cages and clamming operations. The description presented in Parts I, II, and III of this Opinion, above, and in the remaining parts, below, is my attempt to explain these things, or at least enough of them to give a reader a sufficient basis for understanding the story of the Cape Fear's final voyage, presented in Part II, above, and supplemented in the remaining parts of this Opinion.

## V. More Evidence to Support Reasoned Inferences About What Happened On the Final Voyage of Cape Fear

### A. *More About Cape Fear's History and Characteristics*

#### 1. *In General*

More about Cape Fear's history and characteristics is stated in the following way in selected and edited excerpts from Uncontested Cape Fear's Proposed Findings of Fact, Docket No. 77:

14. The F/V CAPE FEAR was built in 1983 in Moss Point, Mississippi. The vessel's original length was 90 feet .... She was assigned an Official Number 655734 and had a Homeport of Cape May, New Jersey. Her International Gross Tonnage was 230 tons. Her International New Tonnage was 69 tons. Exhibit No. 6.

**262**

15. Prior to the vessel's lengthening, it had four clam tanks .... (Transcript Page 66, Lines 20–24; Transcript Page 106, Lines 23–25; Transcript Page 107, Line 1).

16. Prior to the vessel's lengthening, Mr. Koopman ... developed a Stability Book for the F/V CAPE FEAR. (Transcript Page 104, Lines 17–25).

17. Cape Fear, Inc. had ... Wallace & Associates draw up the plans for the 21 foot mid-body addition and to provide the necessary calculations and specifications for its construction and insertion. (Transcript Page 104, Lines 12–16; Transcript Page 105, Lines 7–14).

18. In the spring of 1996, the F/V CAPE FEAR underwent a lengthening which provided for the insertion of a 21 foot addition into the center of the vessel. (Transcript Page 107, Lines 2–13).

19. During the lengthening operations, Cape Fear, Inc. hired Naval Architect Dan Blachly ... at Fairhaven Shipyard and to arrange for the tonnage calculations to be performed for the vessel .... (Transcript Page 108, Lines 9–25).

20. After the lengthening, the vessel had six clam tanks, .... The vessel was 105.1 feet in length. Exhibit No. 6. (Transcript Page 63, Line 8)

21. Warren Alexander instructed Mr. Koopman to develop a post lengthening Stability Book .... (Transcript Page 109, Lines 22–25).

22. ... Naval Architect Koopman provided a second Stability Book for the vessel. (Transcript Page 110, Lines 14–16).

23. A preliminary book was provided and then followed up with a final version on April 12, 1996. Exhibit No. 9. (Transcript Page 110, Lines 14–20; Transcript Page 111, Lines 1–3 and 23–25; Transcript Page 112, Lines 1–7).

24. ... Warren Alexander measured the internal dimensions of the clam cages. (Transcript Page 99, Lines 19–25; Transcript Page 100, Lines 1–4).

25. Warren Alexander ... [reported] the clam cage internal measurements to be 59½ X 45¼ X 33½ inches. (Transcript Page 100, Lines 5–7).

26. The cages were measured in an empty condition both inside and outside of the SeaWatch facilities in New Bedford, Massachusetts. (Transcript Page 100, Lines 11–15).

Docket No. 77 at ¶¶ 14–26.

44. Even though the Stability Book identified that the vessel was capable of carrying 120 cages safely, Captain Novack initially employed the vessel with 110 cages. (Transcript Page 115, Lines 21–25; Transcript Page 116, Lines 1–16).

45. ...[Captain Novack] added 2 cages per trip until he reached the level of 134 cages. (Transcript Page 118, Lines 6–10).

46. Warren Alexander had periodic conversations with Captain Novack wherein the Captain reported the amount of cages carried and his comfort level with those cages. (Transcript Page 118, Lines 11–16).

47. After reaching 134 cages, Captain Novack and Warren Alexander agreed that the vessel should carry 130 cages as its regular cargo. (Transcript Page 118, Line 25; Transcript Page 119, Line 1–19).

*Id.,* ¶¶ 44–47.

Cape Fear had a "wheelhouse" from which she was navigated. Behind and below the wheelhouse is the "deckhouse." Inside the "deckhouse" are the galley, mess area, bunk room, and head or rest room. The bunk room has bunks for five

men. First is a "forward berth." To its right are shelves. Then two berths behind that. Then the head (or rest room), and "then the vestibule." The door into the "vestibule" is a watertight door.

The Cape Fear had a "watertight bulkhead." It is "a solid plate of steel going across the back of the galley area." It is "the back wall" of the "living area." In the watertight bulkhead are two openings. One to the far right is the entry to the galley area, and the other, just above it, is "an entry to the stairway going into the engine room."

Going aft of the watertight bulkhead are the holds.

Cape Fear had six holds, three on the port side (to one's left side when one is in the wheelhouse facing the front ("bow") of the vessel) and three on the starboard side. Odd-numbered tanks are port holds; even-numbered, starboard holds.

As first designed and built, the vessel that later became Cape Fear had only four holds, two fore and two aft. She was 90 feet long. The major modification was to insert a "midsection" between the fore and aft holds. Inserting a "midsection" rather than simply adding two more holds aft may seem odd until one is informed that it is generally agreed that inserting a mid-section into the drive shaft (also called the "axle") connecting the engine (located in the forward section of the boat) and the screw (also called the "propeller"), though a moderately complex engineering feat, is much less difficult to do than removing the screw, adding two holds at the stern, and re-attaching the screw to both the drive shaft and the stern.

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

208. Following the lengthening of the vessel in 1996, one survey was performed for condition and valuation by Surveyor Sperlak. (Transcript Page 132, Lines 9–17).

209. This survey was performed in New Bedford on July 3, 1997. Exhibit No. 13.

*Id.*, ¶¶ 208–209.

214. If a safety inspection is performed on the vessel and no deficiencies are noted, a Safety Decal is given to be exhibited by the vessel. (Transcript Page 136, Lines 20–21).

215. The inspection report addresses all required safety equipment to be contained onboard the vessel, including life saving equipment and safety drills. (Transcript Page 136, Lines 16–19).

216. The F/V CAPE FEAR was inspected on July 3, 1997. Exhibit No. 14. (Transcript Page 137, Lines 5–11).

*Id.*, ¶¶ 214–216.

### 2. *More About Clam Cages*

#### a. *Things to Remember*

A reader may find it helpful, in trying to understand precisely what clam cages are, to take these characteristics into account.

*First.* A clam cage is a cage, not a box. That is, it has no solid side.

*Second.* The top is open.

*Third.* Steel is used to make the sides. The solid pieces used to make the mesh are steel pieces about one-half inch by 2 inches in size.

*Fourth.* Because of the 2–inch width of the wider dimension of the steel, the outside dimensions of the cage are about 4 inches greater (2 inches at each edge) than the inside dimensions.

Keeping these four characteristics in mind, envision a cage that is shaped like an ordinary match box you might find in a mountaineer's cabin where no automatic

devices are available to light fires in a fireplace or in a kitchen stove.

The outside dimensions of the cage are roughly 3 feet by 4 feet by 5 feet. As placed for loading, a cage sits with the shortest dimension upright. Thus, the upright dimension is 3 feet. Two cages stacked upright reach 6 feet plus something for "topping" ("topping" is explained elsewhere in this Opinion). Three stacked upright reach 9 feet plus something for "topping."

Common sense leads seamen to stack the cages in a hold with the largest outside dimension running parallel with an imaginary line running from the center of the stern of the vessel to the center of the bow.

A seaman instinctively wants to use two hands to lift a cage, but also instinctively wants to stack the cages tightly side by side so that when clams are being poured or shoveled into them, no clams fall between cages. Thus, the seaman stacks the cages tightly together but leaves room somewhere (preferably at an outer edge of a stack) for fingers to be inserted to pull one cage at a time away from other cages in the stack.

### b. *More About Procedure for Loading Into Tanks*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

64. Each clam tank contains 15 clam cages, 3′ X 4′ X 5′ in external dimensions, three clam cages abreast and five in the fore and aft direction. (Transcript Page 99, Lines 16–18).

65. As the clams reach the location of the tank to be loaded, a chute directs the clams into the clam cages loading in a forward to aft manner. (Transcript Page 57, Lines 5–8).

66. Once all 15 clam cages are loaded and topped off, the hatch cover to that clam tank compartment is then closed. (Transcript page 94, Lines 20–21).

67. The general procedure is to load [the most forward] clam tanks ... port and starboard, then close the hatch covers. Next [the middle] clam tanks ... port and starboard are loaded and the hatch covers closed. Next [the most aft] clam tanks ... port and starboard are loaded and the hatch covers closed. (Transcript Page 95, Lines 5–23).

68. When all the clam cages below deck are loaded, there are 90 fully loaded and topped off clam cages. (Transcript Page 96, Lines 2–5).

69. In addition to the clam cages stowed below deck in the clam tanks, there are an additional 40 cages stowed on deck. (Transcript Page 98, Lines 8–12).

70. Twelve clam cages are stowed between the hatch coaming and the ship's starboard side, running from the forward end of the coaming aft. The same is stowed on the portside. (Transcript Page 96, Lines 11–18).

Docket No. 77, ¶¶ 64–70.

72. The hatch cover system is an arrangement of six hatch covers .... Each is constructed of quarter inch steel plate and is approximately three inches thick. (Transcript Page 90, Lines 10–17).

73. Each hatch cover sits on a track located inside the hatch coaming. (Transcript Page 90, Lines 24–28; Transcript Page 91, Line 1).

74. The hatch cover surface on the track is provided with a Teflon coating to make sliding the hatch covers along the track more efficient. (Transcript Page 91, Line 1).

75. The hatch covers are opened and closed by use of a capstan with a winch-head from the pilothouse deck. (Transcript Page 89, Lines 6–21).

76. Located forward and aft of the clam tanks on the port and starboard sides of the vessel is a deadman, which is a pipe approximately 15 inches in height. (Transcript Page 87, Lines 5–10).

77. Attached to the top of the dead man is a snatch block. (Transcript Page 87, Lines 9–10).

78. A one and one half inch (1½″) poly plus line is lead from the capstan through the snatch block to a hook point located on either the forward or aft end of the hatch cover. (Transcript Page 86, Line 25; Transcript 87, Lines 1–4).

*Id.*, ¶¶ 72–78.

80. When the J hook is inserted into the hatch cover and turns are taken on the winchhead, the mechanical advantage of the capstan pulls the hatch cover in its intended direction. This either opens or closes the hatch cover. (Transcript Page 89, Lines 14–24).

81. The hatch covers for [the most forward holds] are on the same track. (Transcript Page 91, Lines 2–5).

82. The hatch cover for [the most aft hold] is on a track below the hatch covers for [the middle and most forward holds] and slides beneath the hatch covers in the opening process. (Transcript Page 91, Lines 12–22).

83. Each [set of clam holds], port and starboard, is divided into three sub-sections or clam tanks by two intermediate non-watertight bulkheads. (Transcript Page 74, Lines 1–18).

84. The F/V CAPE FEAR is equipped with one main engine for propulsion and two auxiliary engines for generating electricity. (Transcript Page 76, Lines 11–19).

85. The vessel is fitted with a clam pump which is used to charge the dredge and also to provide suction for the siphoning system. (Transcript Page 76, Lines 2–25; Transcript Page 77, Lines 1–17).

86. Each clam tank is provided with a dewatering pipe from the bottom of the tank to a manifold on the after deck of the vessel. (Transcript Page 77, Lines 19–25; Transcript Page 78, Lines 1–7).

*Id.*, ¶¶ 80–86.

88. Each clam tank has separate valve and piping systems. (Transcript Page 77, Lines 18–20).

89. Each clam tank is also provided with a one inch pipe which runs along the top of the centerline bulkhead of each tank and has nozzles approximately two feet apart. (Transcript Page 81, Lines 1–18).

90. The purpose of this pipe is to provide 40 degree chilled seawater to the clams, which is sprayed through the nozzles. (Transcript Page 81, Lines 7–8).

91. This occurs from May through September and is performed for the purposes of chilling the clams in the summer time and to keep the cargo in good condition. (Transcript Page 81, Lines 19–24).

92. The exterior of each cargo hold consists of a 12 inch coaming running along the exterior periphery of the clam tanks. (Transcript Page 92, Lines 4–24).

93. At the after end of the [most aft] clam tanks, the coaming is cut out in two sections. Each cut out is approximately two and one half feet in the athwart-ship direction . . . . (Transcript Page 93, Lines 1–9).

94. These openings are centered in the aft coaming at the after end of each clam tank ([most aft] starboard and [most aft] port). (Transcript Page 93, Lines 1–13).

95. The purpose of these cutouts is to permit water to drain off the [most aft] hatch covers and run aft and, eventually, off the ship. (Transcript Page 93, Lines 17–22).

96. In relation to [the middle] hatch covers [the most aft] hatch cover extends approximately four inches beneath and forward of the after end of [the middle] hatch cover. (Transcript Page 91, Lines 19–22).

*Id.,* ¶¶ 88–96.

### c. *The Limited Practical Possibilities for Stacking Loaded Clam Cages on the Cape Fear*

From the documents and testimony received in evidence, taken as a whole and with common sense inferences drawn from the admissible evidence received, I find that the following possibilities for loading clams into clam cages are worthy of consideration.

Possibility One: When each cage is fully loaded and "topped" but not overloaded with clams, each hold can carry 15 cages configured in 3–deep stacks in two rows, side by side in the hold. The bottom layer has 4 cages in one row and 3 in the other. Each middle layer has 3 cages. The top layer has 2 cages. The total is 15. Thus, the six holds carry 90 loaded cages. An additional 40 or 42 loaded clam cages are somewhere above the hatches, along with some loose clams for shoveling into cages whose loads have settled during the homeward voyage.

Possibility Two: When each cage is fully loaded and "topped" but not overloaded with clams, each hold can carry 16 cages configured in 3–deep stacks in two rows,

side by side in the hold. Thus, the six holds carry 96 loaded cages. An additional 36 loaded clam cages are somewhere above the hatches, along with some loose clams for shoveling into cages whose loads have settled during the homeward voyage.

In any event, the number of cages regularly loaded in fact, on Cape Fear voyages in 1998, was at least 130 and often 132.

In all configurations, some additional clams were taken aboard in fact and allowed to remain loose on hatch covers, with an expectation that most of them would be shoveled into cages in which clams had settled enough to take them as topping. Any clams remaining loose on hatch covers were allowed to fall off the stern before the vessel reached the harbor, where discharge onto the harbor bottom was strictly forbidden.

### 3. *More About Cape Fear's Pilothouse and Vicinity*

The following are facts about the Cape Fear as described in Lemieux's trial testimony:

Q. Now, behind the pilothouse there is a winch on the upper deck; is that correct?

A. Yes.

Q. And that's the winch that's used to provide the force to pull the hatch covers forward or back, depending on which way you're pulling it?

A. Yes.

Q. And you testified earlier that there is a block or a snatch block at the end of the hatch combing, and that the line would go from the upper deck at the winch all the way back to the pulley and then be attached to the hatch cover to pull it back; is that correct?

A. Yes.

Q. And this is what the deckhands would do to cover all six hatches; is that correct?

A. Yes.

(Day Five, 181).

Q. The pilothouse in the CAPE FEAR has a forward windshield that's open to look forward and a window in the back that looks aft; isn't that correct?

A. Yes.

Q. And in between there is a chart table, if I can call it that?

A. Yes.

(Day Five, 197).

Q. Sir, there's a captain's chair for steering the ship in the pilothouse; isn't that correct?

A. Yes.

Q. Where is that located?

A. In the forwardmost part of the wheelhouse.

Q. All right. And how far back from the forward windows is it?

A. Probably about 8 feet.

Q. Okay. And how far is that chair from the after windows that look out on the rear deck?

A. Excuse me, I'm sorry. What was the question before that again?

Q. Okay. You have a captain's chair right in front of the steering wheel on the CAPE FEAR in the pilothouse; is that correct?

A. Yes.

Q. How far is that chair back from the forward windows?

A. From the forward windows? The width of this desk maybe.

Q. Three feet?

A. Yes.

Q. Okay. And how far is that captain's chair forward of the after windows in the pilothouse?

A. About 8 feet.

Q. Okay. And in order to look out the after windows, you have to get up and walk to the after window; isn't that correct?

A. No. It's a big window. You could see right through it from the forward part of the wheelhouse.

Q. If you're in the forward part of the wheelhouse and you turn around and look out that window, you can't see things that are down on the deck, can you?

A. Not directly below the wheelhouse, no.

(Day Five, 198–199).

### 4. *More About Cape Fear's Equipment*

#### a. *More About a Life Raft*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

411. The F/V CAPE FEAR is required by United States Coast Guard Regulations to have an inflatable liferaft aboard the vessel. (Transcript Page 4–43, Lines 9–11).

Docket No. 77, ¶ 411.

413. The liferaft is designed to release from the vessel ... and to float free .... (Transcript Page 4–43, Lines 12–15).

414. The liferaft's design tethers it to the vessel by a line for the purpose of keeping the liferaft in the vicinity of the vessel after it sinks. (Transcript Page 4–43, Lines 16–25; Page 4–44, Lines 1–7).

415. The tether is to assist the survivors who are in the water by keeping the life raft stationery [sic] in a position above the sunken vessel. (Transcript Page 4–44, Lines 1–7).

416. On January 9, 1999, the Coast Guard Cutter Hammerhead found the F/V CAPE FEAR's liferaft floating above the sunken vessel at 0800 hours. Exhibit No. 21. (Transcript Page 4–43, Lines 2–8).

417. The life raft was inflated and retained its cover. It was tethered to the F/V CAPE FEAR and had deployed sometime prior to its discovery on the morning of January 9, 1999. (Transcript Page 4–45, Lines 3–17).

*Id.,* ¶¶ 413–417.

According to Lemieux's trial testimony:

Q. Now, sir, you were also aware where the life raft was stowed?

A. Yes.

Q. Did Captain Novack tell you that?

A. No. These things I made a point of finding on my own.

(Day Five, 203).

Q. .... And did Captain Novack ever teach you, sir, about the life raft?

A. No.

Q. Did he ever teach you how to abandon ship?

A. No.

Q. And he never taught you how to put the survival suit on too; is that correct?

A. No, he didn't.

(Day Five, 203–204).

**b.** ***More About Survival Suit Examination***

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

419. The petitioner engaged the services of Surveyor David DuBois of Marine Safety Consultants, Inc. to examine the survival suits obtained by the United States Coast Guard shortly after the sinking. (Transcript Page 6, Lines 18–21).

420. David DuBois attended the United States Coast Guard facility in Providence, Rhode Island on January 22, 1999. (Transcript Page 6–9, Lines 15–17)

421. He examined five survival suits and closely examined two of the survival suits. The first one was identified as the one removed from the body of Paul Martin. (Transcript Page 6–9, Lines 18–25; Transcript Page 6–10, Lines 1–10).

422. He opened up the Paul Martin survival suit and took five pictures of the survival suit identified as Exhibits 22A, B, C, D and E. (Transcript Page 6–10, Lines 17–25; Transcript Page 6–11, Lines 1–6).

423. His examination of the Paul Martin survival suit consisted of a visual examination of the suit for its condition and an operational examination of the zipper. (Transcript Page 6–14, Lines 18–24).

424. He found that the zipper assembly was attached to the survival suit by stitching. (Transcript Page 6–14, Line 25; Transcript Page 6–15, Lines 1–2).

425. The stitching was intact and in good order. (Transcript Page 6–15, Lines 4–9).

426. A closer examination of the teeth of the zipper revealed that the teeth were wet, evidenced sand, and that the whole suit admitted an odor of diesel oil. (Transcript Page 6–15, Lines 10–17).

427. On closer examination Mr. DuBois did not find any teeth missing or damaged, he found a small build up of green coloring .... (Transcript Page 6–15, Lines 18–25).

Docket No. 77, ¶¶ 419–427.

432. Mr. DuBois then examined the single battery flashlight or strobe light

attached to the survival suit. (Transcript Page 6–16, Lines 24–25; Transcript Page 6–17, Lines 1–2).

433. The body of the strobe light was intact and evidenced no physical damage. (Transcript Page 6–17, Lines 24–25; Transcript Page 6–18, Lines 1–8).

434. It was wet on the inside and evidenced corrosion from saltwater both inside and outside of the light. (Transcript Page 6–18, Lines 2–8).

435. The strobe light was approved by the United States Coast Guard. (Transcript Page 6–19, Lines 12–16).

*Id.,* ¶¶ 432–435.

442. He examined the second suit reflected in Exhibit 23 A through E. (Transcript Page 6–11, Lines 12–13).

443. Mr. DuBois found no evidence of any stitching or defects or rips in the suit itself. (Transcript Page 6–23, Lines 8–11).

444. The zipper assembly was intact and undamaged. (Transcript Page 6–23, Lines 12–14).

445. All the teeth were intact and did not exhibit any damage or missing teeth. (Transcript Page 6–23, Lines 15–18).

446. He attempted to operate the zipper in the same manner as the Paul Martin zipper. (Transcript Page 6–23, Lines 19–20).

*Id.,* ¶¶ 442–446.

449. He visually examined the other three survival suits.... (Transcript Page 6–24, Lines 16–25; Lines 1–7).

*Id.,* ¶ 449.

B. *More About Stability and Seaworthiness*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77), circumstances bearing on Cape Fear's Stability and Seaworthiness were as follows:

106. The Petitioner provided naval architectural testimony from Captain David L. Folsom who was employed by Marine Safety Consultants as a naval architect and marine engineer. (Transcript Page 2–77, Lines 10–15).

107. Captain Folsom graduated from the United States Coast Guard Academy with a Bachelor of Science degree in engineering and obtained a Master's Degree in Naval Architecture and Marine Engineering from the Massachusetts Institute of Technology. He is a member of the Society of Naval Architects and Marine Engineers and the American Society of Safety Engineers. After graduating from the Coast Guard Academy, Captain Folsom served on two Coast Guard cutters and then matriculated at MIT to obtain his master's degree.

After graduating MIT, he commenced serving in the Coast Guard in technical branches as a naval architect. He served in the U.S. Coast Guard Merchant Marine Technical Branch in the third Coast Guard district, in the Office of Research and Development of the United States Coast Guard Headquarters in Washington, the Merchant Marine Safety Branch of the Office of Research and Development, and also as executive officer in the Marine Safety Office in Boston. During 24 years of service in the United States Coast Guard, he applied his naval architectural training and experience .... He retired from the United States Coast Guard in June, 1991 .... (Transcript Page 2–91, Lines 15–21)

108. Captain Folsom is qualified to provide opinions on naval architectural and marine engineering subjects.

109. Captain Folsom first became involved with the sinking of the F/V

CAPE FEAR in early January, 1999 at the request of David DuBois, president of Marine Safety Consultants. (Transcript Page 2–93, Lines 17–25, Transcript Page 2–94, Line 1).

110. His initial contact was to address questions concerning the stability of the F/V CAPE FEAR. (Transcript Page 2–93, Lines 17–25, Transcript Page 2–94, Line 1).

111. Captain Folsom did not testify at the United States Coast Guard hearings nor did he attend those hearings. As part of Captain Folsom's professional experience, he has performed stability analysis including intact stability, damage stability, and structural evaluations of vessels for the purposes of recommending repairs and alterations. (Transcript Page 2–94, Lines 12–14, Transcript Page 2–94, Lines 21–25, Transcript Page 2–95, Line 1).

Docket No. 77, ¶¶ 106–112.

114. Captain Folsom described the various terms used in stability of a vessel and explained the purpose of the righting arm as a measure of energy to return a vessel from a heeled position to an upright condition. (Transcript Page 2–95, Lines 2–25).

Id., ¶ 114.

117. The purpose of a stability book is to give guidance to the operating personnel as to how to load the vessel to maintain it in a safe operating condition. (Transcript page 2–96, Line 25, Transcript Page 2–97, Lines 1–3).

Id., ¶ 117.

122. In calculating the stability of the F/V CAPE FEAR under various conditions, Captain Folsom utilized the Hull Offset File .... (Transcript Page 2–98, Lines 24–25, Transcript Page 2–99, Lines 1–8).

123. The Hull Offset File is data inputted into Captain Folsom's computer using a software program called Max-Serve. (Transcript Page 2–101, Lines 11–25, Transcript Page 2–102, Lines 1–8).

124. This program is accepted in the naval architectural community for purposes of determining stability. (Transcript Page 2–102, Lines 13–16).

125. Once the Hull Offset information is entered into the computer, it creates a hull model providing the geometry of the vessel for stability calculations. (Transcript Page 2–98, Lines 8–23).

126. The hull model utilized by Captain Folsom was of the modified F/V CAPE FEAR after the mid-body section was installed in the vessel in 1996. (Transcript Page 2–99, Lines 12–25).

127. In order to determine the light ship weight of the vessel, Captain Folsom utilized the ... Stability Book. Exhibit No. 9. (Transcript Page 2–100, Lines 10–14).

Id., ¶¶ 122–127.

131. The liquid weight utilized by Captain Folsom is:

A. The fresh water tank forward was full. The hydraulic oil tank was three-quarters full. The double bottom fuel oil tanks were full. The No. 2 double bottom fuel oil tanks were full. The aft hydraulic tank was about three-quarters to seven-eights full. The port double-bottom ballast tank was full. The starboard double-bottom tank was full. The No. 2 port L bottom tank was empty, and the starboard double-bottom tank was about a third to half full. And all of the wing tank voids were empty, and the three ballast tanks across the stern of the vessel were also empty.

(Transcript Page 2–102, Lines 23–25, Transcript Page 103, Lines 1–13).

*Id.,* ¶ 131.

133. The United States Coast Guard issues minimal stability requirements for fishing vessels of the size and class of the F/V CAPE FEAR. (Transcript Page 2–104, Lines 12–16).

*Id.,* ¶ 133

136. Under the United States Coast Guard Regulations each vessel in the size and class of the F/V CAPE FEAR must meet intact stability requirements called Torremolinos' criteria and requirements for severe wind and heel criteria. (Transcript Page 2–104, Lines 17–25, Transcript Page 2–105, Lines 1–13).

*Id.,* ¶ 136.

140. There is a third criteria with regard to icing, but this was not applicable under the weather conditions that the vessel experienced on January 8, 1999. (Transcript Page 2–106, Lines 21–24).

*Id.,* ¶ 140.

147. The first calculation requested of Captain Folsom was to determine the stability of the F/V CAPE FEAR with 130 cages, each having a 32 bushel capacity, and an additional five bushels of clams on top of each cage. (Transcript Page 2–108, Lines 1–8).

*Id.,* ¶ 147.

151. In performing this stability analysis, the computer program also determined the freeboard at the stern. (Transcript Page 2–109, Lines 1–3).

*Id.,* ¶ 151.

159. The computer program also determined the freeboard at the stern of the vessel at its centerline .... (Transcript Page 2–110, Lines 18–25).

160. Captain Folsom opined that under both stability calculations, the freeboard at the stern met the requirements of the Stability Book ... following the vessel's lengthening. (Transcript Page 2–111, Lines 1–6).

*Id.,* ¶¶ 159–160.

163. Captain Folsom was next asked to assume that the port after ... hatch cover was left opened three to six inches from the after coaming. (Transcript Page 2–112, Lines 13–16).

164. He performed a stability calculation with ... [the most aft] tanks flooded and with a cargo of 130 cages and 32 bushels per cage and five bushels on top of each cage. (Transcript Page 2–112, Lines 17–19).

165. He found that the ability to meet the United States Coast Guard requirements was significantly reduced and that the vessel did not meet the intact stability once the [most aft] tanks were flooded. (Transcript Page 2–112, Lines 24–25, Transcript Page 2–113, Lines 1–2).

166. He found that the load condition of the vessel did not generate enough righting arm energy to satisfy the Coast Guard criteria with the [most aft] tanks flooded. (Transcript Page 2–113, Lines 3–14).

167. The effect of the lack of righting arm energy made it easier for the vessel to roll, ..., with potential of sinking the vessel. (Transcript Page 2–113, Lines 15–20).

*Id.,* ¶¶ 163–167.

169. Captain Folsom next addressed his opinions to whether each individual clam tank should be provided with flooding alarms. (Transcript Page 2–117, Lines 19–22).

*Id.,* ¶ 169.

174. In addressing the claim by the Claimants that each hold should have

watertight transverse bulkheads, Captain Folsom stated that there is no United States Coast Guard requirements for watertight transverse bulkheads. (Transcript Page 2–120, Lines 10–13).

*Id.*, ¶ 174.

184. The purpose of the small cutout in the after coaming is to allow drainage of water from the top of the hatch covers onto the deck and eventually overboard. (Transcript Page 2–120, Lines 23–25, Transcript Page 2–121, Lines 1–3).

*Id.*, ¶ 184.

## C. *More About Cape Fear's Crew*

### 1. *In General*

As stated in Uncontested Cape Fear's Proposed Findings of Fact, Docket No. 77, are the following facts about Cape Fear's crew:

27. The regular crew aboard the F/V CAPE FEAR was Steven Novack as Captain, James Haley, Jr. as Mate, and Paul Martin, Steven Reeves, and Douglas Kelley as Deckhands. (Transcript Pages 5–125, Lines 7–17).

28. Captain Steven Novack was employed on other vessels operated by corporations owned by Warren Alexander prior to 1994. (Transcript Page 112, Lines 24–25; Transcript Page 113, Line 1).

29. Captain Novack was initially hired as a Captain and came with very high recommendations from his previous company, American Original. (Transcript Page 113, Lines 2–23).

30. In 1994, when Cape Fear, Inc. purchased the F/V CAPE FEAR, Captain Novack was assigned to the vessel as permanent Master. (Transcript Page 114, Lines 2–3).

31. Captain Novack was permanent Master of the F/V CAPE FEAR from 1994 until January 8, 1999. (Transcript Page 114, Lines 22–25).

32. The Mate, James Haley, Jr., was hired as the vessel's permanent mate from the date of its purchase. (Transcript Page 115, Lines 6–10).

33. On occasions when Captain Novack was off the vessel, Mate Haley served as relief captain. (Transcript, Page 115, Lines 1–4).

34. Joseph Lemieux joined the F/V CAPE FEAR in the Fall of 1997. (Transcript Page 5–124, Lines 6–10).

35. When a regular crewmember took a trip off, Mr. Lemieux filled in as a deckhand. (Transcript Page 5–124, Lines 14–21).

36. From the Fall of 1997 until the time of the sinking, Mr. Lemieux worked approximately two (2) weeks a month on the vessel. (Transcript Page 5–175, Lines 9–12).

37. Half the time that the vessel was in operation . . ., Mr. Lemieux was working as a member of the crew. (Transcript Page 5–175, Lines 13–15).

38. Mr. Lemieux sailed on 42 fishing trips in 1998, equal to approximately 40 percent of the trips fished by the vessel. Exhibit No. 17. (Transcript Page 120, Lines 17–18).

39. Mr. Lemieux believed that Captain Novack was a good Captain. (Transcript Page 5–210, Lines 1–3).

Docket No. 77, ¶¶ 27–39.

According to Joseph Lemieux, testifying at trial on Day Five, he first started working aboard Cape Fear in the fall of 1997. He was hired as a relief member on a trial basis and was made a permanent member of the Cape Fear crew later. (Day Five, 174–175). He customarily sailed about two weeks per month. (Day Five, 175).

Q. And you've testified, sir, that you first joined the vessel in the fall of '97.

That's the first time you started fishing; isn't that correct?

A. Yes.

Q. And other than the one or two fill-in trips on the JOHN N and the JERSEY DEVIL, all your time at sea has been on the CAPE FEAR; isn't that correct?

A. Yes.

Q. So everything that you learned as far as working as a deckhand, safety drills, things of that nature, would all have been on the CAPE FEAR; is that correct?

A. Yes.

(Day Five, 200).

Q. Now, sir, you brought a lawsuit against this ship, did you not?

A. Yes.

Q. You brought a claim, and that was settled?

A. Yes.

Q. Okay. Now, sir, with regard to Mr. Alexander, you never told Mr. Alexander at any time prior to the sinking that he was letting—that the vessel was overloaded, did you?

A. No.

Q. And, sir, isn't it true that you never complained to Mr. Alexander that the vessel was fished in unsafe weather conditions, did you?

A. No. To do that would mean you'd probably lose your job.

Q. Sir, and you never complained to Mr. Alexander that the hatches were not secured properly on any prior trips, did you?

A. No.

Q. In point of fact, you never made any complaints to Mr. Alexander until the time you brought the lawsuit; isn't that correct?

A. Yes.

Q. And it was your feeling that Captain Novack was a good captain, was he not?

A. Generally speaking, yes.

(Day Five, 209–210).

## 2. *More About Paul Martin*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

365. On January 9, 1999, the body of Paul Martin was found floating approximately 15 to 20 feet off the beach at West Island near Gooseberry Point. (Transcript Page 2–31, Line 4; Page 2–32, Line 1, 2; Page 2–34, Line 1).

366. The body was floating face down and appeared lifeless. (Transcript Page 2–34, Lines 8–20).

367. Officers Cestodio and ... entered the water and pulled the body ..., dragging it up onto the beach approximately 15 to 20 feet .... (Transcript Page 2–45, Lines 1–24; Page 2–46, Lines 1–4).

368. The body was laid face down in the sand. No medical treatment was provided. Exhibit No. 127. (Transcript Page 2–46, Lines 5–24; Page 2–47, Line 1).

369. When the body was turned over, it was observed that the survival suit zipper was open .... (Transcript Page 70, Lines 13–23; Page 2–27, Lines 19–22).

370. It was also observed that there was a lot of sand on the shirt of the decedent under the survival suit. Exhibit No. 121. (Transcript Page 2–48, Lines 10–12).

371. At this time, it was also observed that the strobe light switch was in the "Off" position. Exhibit No. 122. (Transcript Page 2–51, Lines 2–7).

372. The survival suit strobe light exhibited brown liquid within its lens,

but was not tested to determine its nature. (Transcript Page 2–52, Lines 4–22).

373. Officer Camire attempted to close the zipper by using his right hand only and not holding the exposure suit with his left hand. (Transcript Page 2–50, Lines 12–22).

374. He observed the zipper .... (Transcript Page 2–49, Lines 7–24; Page 2–50, Lines 1, 2).

375. He attempted to close the zipper three or four times over a period of four to five seconds. (Transcript Page 2–53, Lines 6–11).

376. In respect to the strobe light, he spent approximately 30 to 45 seconds observing its condition. (Transcript Page 2–53, Lines 12–21).

377. At no time did Officer Camire make any tests to determine the nature of the substance within the strobe light other than observing that it was a liquid. (Transcript Page 2–52, Lines 4–11).

Docket No. 77, ¶¶ 365–377.

379. Exhibit No. 121 depicts the body's position when it was rolled over on the beach. (Transcript Page 2–36, Lines 24–25; Page 2–37, Lines 1–4).

*Id.,* ¶ 379.

386. Officer Connor did not observe any corrosion on the zipper, any missing teeth, or any defective part or seam at the time he operated the zipper. (Transcript Page 74, Lines 22–25; Page 2–76, Lines 6–19).

*Id.,* ¶ 386.

390. The strobe light on Mr. Martin's suit is United States Coast Guard approved and requires the wearer to switch the strobe light into the operational mode. (Transcript Page 3–85,

Lines 21–25; Transcript Page 3–86, Lines 1–7).

*Id.,* ¶ 390.

### 3. *More About Steven Reeves*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

403. When Mr. Reeves exited the pilothouse to abandon ship he had his survival suit on half way up to his waist. (Transcript Page 5–204, Lines 22–25).

*Id.,* ¶ 403.

405. While in the water screams were heard from Mr. Reeves yelling for help. (Transcript Page 5–207, Lines 16–22).

406. He was yelling "somebody help me" or words to the effect of "help" or "help me." (Transcript Page 5–207, Lines 20–22; Transcript Page 5–208, Lines 1–8).

*Id.,* ¶¶ 405–406.

408. Deckhand Reeves was lost at sea and his body was never recovered. 

*Id.,* ¶ 408.

### D. *More About Captain Novack's Authority and Common Practice on Cape Fear*

#### 1. *In General*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77), the following are facts bearing upon Captain Novack's authority and the common practice aboard Cape Fear with Novack as Captain.

40. The Captain of the vessel is in control of the vessel after it leaves port. (Transcript Page 189, Lines 13–16).

41. The Captain is responsible for the safety of the crew, the operation of the vessel, and the entire fishing operation. (Transcript Page 189, Lines 17–24).

42. The Captain decides when the vessel is to fish and is responsible for the overall operation of the vessel at sea. (Transcript Page 189, Line 25; Transcript Page 190, Lines 1–7).

43. After the F/V CAPE FEAR was lengthened in the Spring of 1996, Captain Novack re-employed the vessel in the offshore quahog industry. (Transcript Page 115, Lines 15–20).

*Id.*, ¶¶ 40–43.

49. In 1998, the year preceding the vessel's sinking, the F/V CAPE FEAR made 104 fishing trips. (Transcript Page 120, Lines 20–25; Transcript Page 121, Line 1).

50. Seventy-one of those trips carried clam cages in excess of 120 cages. Exhibit No. 17. (Transcript Page 120, Lines 17–18).

51. Of those 71 trips, 15 trips carried cages in excess of 130 cages and 52 trips carried 130 cages. Exhibit No. 17. (Transcript Page 120, Lines 17–18).

*Id.*, ¶¶ 49–51.

More of Lemieux's description follows:

Q. On prior trips, had you observed the [aft] port hatch open, as on this trip?
A. There had been a few trips previous. Not the two trips before, but there had been other trips at different times where that has happened before where the splices broke, and they just tied a knot in it to continue working.
Q. I'm going to show you a photograph marked as Exhibit No. 2, and actually there is a thing sticking up on the starboard side. It's like a post. Do you see what I'm talking about?
A. Yes.
Q. Okay. And in Exhibit No. 2, the post at the far end of the starboard side [most aft] hatch cover, is that the post with the block you're referring to?
A. Yes, it is, right here.

Q. And is that the rope? There's also a rope in that photograph. Is that the rope you were referring to?
A. Yes.
Q. Okay. So you got back on deck when all 90 of the cages that were stored down below had all been filled, correct?
A. Yes.
Q. And now you guys were filling the 40 cages which were placed on deck, correct?
A. Yes.
Q. Okay, how long did it take, approximately, to get those 40 filled on deck?
A. It would depend where we're fishing, how quickly we were catching.
Q. Do you specifically remember?
A. Usually, on average it would probably be around seven or eight hours.

(Day Five, 139–140).

## 2. *More About Log Books*

According to Lemieux, Captain Novack kept "a book" on the Cape Fear. Lemieux testified, "[h]e wrote down where on the grounds" Cape Fear "fished," and "how well he was catching." (Day Five, 132).

Lemieux testified that he "was not aware" of Captain Novack even writing down "dates for when he checked and replaced safety equipment". (Day Five, 132). Lemieux would "spend time in the wheelhouse with Novack when Lemieux was on Cape Fear," and knew they had "quite a few books" in the wheelhouse, but "never really looked at them very much." (Day Five, 132).

202. The F/V CAPE FEAR kept a Captain's log in the pilothouse of the vessel. (Transcript Page 161, Lines 14–16).

203. The log contained entries addressing the trip, area fished, the time

of fishing, repairs, ..., change of wire, and things of that nature. (Transcript Page 161, Lines 17–20).

204. The log was never recovered when the vessel sank. (Transcript Page 161, Lines 21–22).

*Id.,* ¶¶ 202–204.

### 3. *More About Marketing Clams*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

99. Cape Fear, Inc. sells its clams ... to SeaWatch in New Bedford, Massachusetts. (Transcript Page 101, Lines 3–5).

*Id.,* ¶ 99.

### 4. *More About Unloading and Previous Topping Off*

As stated in Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

101. When the vessel arrives in port the clam cages are removed by shoreside crane by the use of a spreader bar and two (2) hooks which attach to the holes at the top of each cage for lifting. (Transcript Page 98, Lines 13–25; Transcript Page 99, Lines 1–15).

*Id.,* ¶ 101.

According to Lemieux's trial testimony:

Q. Okay. Now, on the last trip, on the trip the vessel sank, were 130 cages loaded with clams?

A. Yes.

Q. Were you familiar with the term "topped off"?

A. Yes.

Q. What does "topped off" mean?

A. That's adding extra shovelfuls of clams on the top of the cage to round it off.

.    .    .    .    .

Q. Were there any instructions regarding topping off?

A. Yes.

Q. What were those instructions?

A. To round off the top of the cages because if they settled down and there was any space that was open in the top of the cage when it got back to the dock, we were told that we would be cut pay.

Q. And who told you that?

A. That came from the captain and Mr. Alexander, and he had done it to other boats.

(Day Five, 142–143).

### 5. *More About Place Cards (Placards)*

Joseph Lemieux testified that Cape Fear had "place cards" (also called "placards") in place in the galley with respect to "the donning of survival suits." It did not have a "place card" regarding "man-overboard drills" or the liferaft, but it did have a liferaft on board. (Day Five, 176). Also, it had an EPIRB. (Day Five, 176).

### 6. *More About the Weather and Its Consequences*

The weather, according to Lemieux, was a mixture of rain and snow squalls, "almost blowing sideways rather than coming straight down," and with "high seas." (Day Five, 177). In these conditions, "it would be difficult for somebody in the water to see an EPIRB or a life raft." (Day Five, 177).

### 7. *More About Safety Drills*

With respect to safety drills, the following facts are from Uncontested Cape Fear's Proposed Findings of Fact (Docket No. 77):

189. The last time Warren Alexander sailed as master of a fishing vessel was 10 years prior to the loss. At that

time there were no regulations requiring any type of safety drill onboard the vessel. (Transcript Page 157, Lines 13–22; Transcript Page 158, Line 4).

190. Warren Alexander never performed any type of safety drills on a vessel. (Transcript Page 158, Lines 5–7).

Docket No. 77, ¶¶ 189–190.

192. United States Coast Guard then implemented mandatory regulations requiring the performance of onboard vessel life saving drills. (Transcript Page 130, Lines 22–25).

*Id.,* ¶ 192.

194. When these regulations came into affect [sic], Cape Fear, Inc. sent Captain Novack to a safety drill instructor class in Cape May, New Jersey. (Transcript Page 131, Line 3–11).

195. Captain Novack attended the course, passed the course requirements, and was provided with a certificate of compliance. Exhibit No. 12. (Transcript Page 131, Lines 12–18).

196. The course certified that Captain Novack was qualified to perform safety drills as required by the Coast Guard regulations. Exhibit No. 12. (Transcript Page 131, Line 25; Transcript Page 132, Lines 1–3).

*Id.,* ¶¶ 194–196

198. The safety drills are required to be performed onboard the vessel. (Transcript Page 157, Lines 7–9).

*Id.,* ¶ 198.

205. Claimants' expert, Admiral Linnon, admitted that the Master is a proper person to perform the safety drills and Captain Novack with his certification properly fills that requirement. (Transcript Page 3–76, Lines 1–11; Transcript Page 4–14, Lines 6–25; Transcript Page 4–15, Lines 1–10).

*Id.,* ¶ 205.

207. Admiral Linnon has no information that indicates that Captain Novack was not properly trained to conduct the drills. (Transcript Page 4–15, Lines 11–13).

*Id.,* ¶ 207.

218. From the time of the mandatory safety drill requirement, until the vessel was lost, no crewmember ever complained to Warren Alexander that safety drills were not being performed aboard the vessel. (Transcript Page 158, Lines 13–21).

*Id.,* ¶ 218.

220. The performance of drills does not guaranty donning a survival suit or evacuating the vessel under an abandon ship drill is going to save the crewmember's life. (Transcript Page 4–13, Lines 8–11).

221. Should the vessel capsize, which changes the working platform of the vessel, drills may not be effective. (Transcript Page 4–13, Lines 15–17).

222. In respect to donning a survival suit, a period of 1 to 1 ½ minutes is considered very fast. (Transcript Page 4–54, Lines 15–25; Transcript Page 4–55, Lines 1–3).

*Id.,* ¶¶ 220–222.

When asked about safety drills Joseph Lemieux stated, "[t]he only thing that would come close to that would be the other guys talking about—once in a while saying, 'well, if you have to get in a survival suit, make sure you[ ] take your boots off because it's easier.' But besides that—you know, that was just idle conversation from time to time. It wasn't conducted as a training drill or anything like that." (Day Five, 127). When asked whether formal safety training was ever provided

on the Cape Fear, Joseph Lemieux answered, "[n]o." I credit this testimony of Joseph Lemieux and so find.

Joseph Lemieux also testified that he never participated in any "man-overboard" drills nor any drills involving "donning" immersion suits. (Day Five, 127–129). I credit this testimony of Joseph Lemieux and so find.

### E. *Salvage*

An attempt was made to raise the Cape Fear for salvage, but it resulted in further damage to the vessel. In the end, no salvageable equipment was on the vessel. The Cape Fear was donated to "an outfit in Long Island." The Cape Fear was then sunk to build a fish reef. (Day One, 151–155).

### VI. More About Interlocking Ownership of Vessels and Shore Facilities

Warren J. Alexander is a resident of Warren, Rhode Island (Day One, 54), which is within commuting distance by car of the Seawatch International facilities at New Bedford, Massachusetts, harbor.

Mr. Alexander graduated from Wildwood Catholic High School, Wildwood, New Jersey, in 1970. (Day One, 54).

He holds a United States Coast Guard operator's license to operate a commercial fishing vessel, which every captain in the fishing industry must have, but he did not have any formal education or technical training and was not required to take any examination. (Day One, 55).

He organized the company, Cape Fear, Inc., in 1994, incorporating it in New Jersey. Its principal place of business was and is Cape May, New Jersey. (Day One, 55–56). He is President. (Day One, 56). His ex-wife is a co-owner, and is Secretary and Treasurer. (Day One, 178). The company has a small office on the dock at New Bedford. (Day One, 57–58). In that office, "weekly trip reports" and things such as "requisition parts lists" were kept for one year and then routinely "emptied" and sent to "the Cape May office." (Day One, 179). It is possible that another corporate entity of the same name had existed many years earlier, and was the owner of the Cape Fear before she passed through other ownership and finally to Warren J. Alexander. This Opinion does not pursue that inquiry because it does not appear to be relevant to any issue material to these Exoneration Proceedings.

In 1998 and 1999, the only fishing vessel owned by Cape Fear, Inc., was the Cape Fear, which the company acquired in 1994, the company having been formed for the purpose of making that acquisition. (Day One, 56).

The principal business of the company throughout the period before Cape Fear sank was "harvesting clams" or "fishing ocean quahogs." This was done "under a quota system from the National Marine Fisheries Service. The boat goes out, harvests ocean quahogs by method of a hydraulic dredging system. The clams are brought aboard, dumped into a hopper, through a sorting machine down a conveyor into the holds, and in cages on deck through another conveyor, they are brought in. In this instance, with the CAPE FEAR, all the product off that vessel was sold to a company named SeaWatch .... They are sold to SeaWatch, who then receives them. They have a shucking facility in New Bedford. The product is shucked there, and then it is trucked to one of their canneries down South, where it is then canned and then sold in the retail market." (Day One, 56–57).

SeaWatch, to which Cape Fear, Inc., sold Cape Fear's clam harvest, had a "shucking" facility for processing clams at its New Bedford dock. "Where the boats

pull up, there's an offloading dock where a crane offloads the cages of clams. They are then either taken into a cooler, or if they are in the process of shucking, they are taken inside the plant, put into a hopper, which runs them through another sorting machine, which then goes into the shucking machine. When they come out, it's just the meat out of the shell." (Day One, 58). The facility of Cape Fear, Inc., was located "right on" the SeaWatch dock. (Day One, 59). The Cape Fear facility was a small office, approximately 8 feet by 10 feet, with chartboards and clipboards to keep updated records on Cape Fear and other boats in which Mr. Alexander had ownership interests. The office was managed by Mr. Alexander and one assistant, Tom Becica. (Day One, 59).

Mr. Alexander's responsibilities in Cape Fear, Inc., were "overseeing the operation from the shore side." On a regular basis, he was "at the property approximately 12 hours a day, and if supplies or stuff" were needed he picked "them up for the vessels." (Day One, 59–60).

Alexander and Becica were rarely on board a vessel, even at the dock, but Becica "stay[ed] in personal contact with the captains on their needs" for their vessels. (Day One, 60). Becica also did some maintenance work on the vessels. (Day One, 61).

Tom Becica's formal title was "shore engineer" for Southern Clam, another corporation in which Alexander had an ownership interest. Southern Clam was "basically just our shoreside company." It did not own any vessel. (Day One, 60–61).

Other than Cape Fear, Mr. Alexander had [financial] interests in the Misty Dawn and Miss Myrna. A separate corporation owned each. (Day One, 61–62).

## VII. More About Alexander's Testimony at Trial

Warren J. Alexander testified on Day One of the trial in the Exoneration Proceedings about his familiarity with the Cape Fear and her clamming, and his knowledge and understanding of record keeping, maintenance, and other routines.

According to Mr. Alexander, Captain Novack kept a "Captain's Log." It contained "anything" that was going on "on the vessel as far as its trip, area where you worked, time fishing, repairs, his drills, changing a wire, things of that nature." The log was never recovered after the sinking. (Day One, 161).

Tom Becica would notify Alexander "of major problems with vessels when they were reported to him by the captain[s]". He would have reported any "unseaworthy condition or a condition that would prevent the vessel from going to sea." He did not report any such condition of Cape Fear at "any time before January 7, 1999." (Day One, 162).

Cape Fear did not have "any problems" with her "hatch covers" before "January of 1999." She did not have "any reoccurring problems" with any "specific piece of machinery" before "January of 1999." (Day One, 162).

Placards were "posted within the wheelhouse." One concerned "the discard of rubbish, donning survival suits." There was a proper "life jacket placard," and "a general alarm placard." (Day One, 162–163).

Alexander delegated to the captain "the duty and responsibility for performing the safety drills that were required by the Coast Guard." (Day One, 163).

Alexander boarded the Cape Fear in port often, and observed its condition, including combing and hatch covers, when he was aboard. (Day One, 166–177).

The longitudinal "bulkhead" on the Cape Fear was "watertight." Also, the bulkheads between "the starboard first, second, and third" holds were "not watertight." (Day One, 179).

## VIII.  Testimony of the Expert Witnesses

### A.  *DuBois*

David DuBois is employed by Marine Safety Consultants, Inc., "a private sector marine surveying and accident investigation and appraisal company." (Day One, 35). Mr. DuBois was employed by Petitioner to conduct an appraisal of the value of the Cape Fear after January 8, 1999.

Mr. DuBois testified to his investigation and conclusions as follows:

Q.  ... could you please provide the Court what your examination consisted of?

A.  My examination consisted of a review of the vessel's components based on documents that were provided. I also had access to other vessels of that type. I boarded other vessels of that type to determine how they were outfitted and laid out, and I also had the occasion to examine the vessel after it was raised by a salvor.

Q.  Okay. And what was your opinion as to the value of the vessel on January 8, 1999, sir?

A.  It was my opinion at the time, the vessel after it sank had zero value.

Q.  And why is that?

A.  Because basically a vessel sitting on the bottom is not worth anything other than a business determination if it's ever going to be raised to try to reconstruct it.

Q.  And, sir, did you also determine whether the vessel had any pending freight?

A.  Yes.

Q.  And what did you evaluate the amount of freight as?

A.  Zero.

(Day One, 37–38)

During cross examination it became clear that the vessel, before its sinking, had value but that it was Mr. DuBois' opinion that the cost of raising and repairing the vessel exceeded its value before the sinking. Mr. DuBois testified as follows:

Q.  Sir, you told us that the formula you use is, one, take the salvage cost, two, add the repair cost, and subtract that number from the value of the vessel before the sinking. That's the formula, correct?

A.  Yes, sir.

Q.  Okay. So you need to know, one, what is the salvage cost. And your testimony is, you don't know what the contract price for the salvage was?

A.  I don't remember the exact price. I think I testified it was somewhere in excess of $200,000.

Q.  In addition to that, you also made an estimate of the repair cost, correct?

A.  Yes, sir.

.    .    .    .    .

Q.  Okay, now, your estimate of the cost of repairing the vessel and bringing her up to the preaccident condition was $352,500 for the cost, to which you added an additional amount for ten percent contingency, which brought it up to $392,500.

.    .    .    .    .

Q.  And with respect to the fishing vessel CAPE FEAR, you did not go out and independently evaluate the value of the CAPE FEAR the day before she sank; is that correct?

A.  The day before, no, sir.

Q. In fact, you did not independently have an opinion as to the value of the CAPE FEAR the day before she sank, did you, independently?

A. Prior to this? No, sir.

(Day One, 42–45)

I find that Mr. DuBois did not properly estimate the value of the CAPE FEAR. The statement that the vessel was worth no more "than a business determination if it's ever going to be raised to try to reconstruct it," is not helpful to the court. The court must come to its own conclusion, independent of petitioner's business judgment, as to the value of the vessel. Mr. DuBois should have investigated and made an estimate of the Cape Fear's value either before it sank or after it was repaired. The court finds that the vessel may have had a positive value that at this time is undetermined.

### B. *Linnan*

Admiral Linnan was called by claimants to discuss alleged deficiencies in the seaworthiness of the craft before it left on its final voyage. In Part IX.C. the court explains that its findings and decisions are based on events that occurred during the final voyage of the Cape Fear, and does not depend on whether the Cape Fear was seaworthy or not when it initially left port. Moreover, much of Admiral Linnon's testimony, especially with regard to the heightened risk from alleged violations of Coast Guard regulations, is not quantified and does little to assist the court in determining what were the causes of this disaster.

### C. *Clifford A. Gouley*

Mr. Gouley is an engineer who currently serves as the marine advisory leader to the Massachusetts Institute of Technology Sea Grant College Program. He was called by claimants as an expert in the technical aspects of ship design and stability. He provided technical information to the court regarding the causes of the sinking of the Cape Fear and his assessment of the Cape Fear's stability.

Some questions were raised, however, about Mr. Gouley's qualifications and conclusions as he has no experience in ship design nor has he ever been a member of a "classification society ... that regulates the construction of vessels ... and ... passes on the stability requirements of vessels." (Day Five, 9–10). Nor does Mr. Gouley appear to have much familiarity with clamming vessels. (Day Five, 17–18). Mr. Gouley does have mathematical and engineering experience, however, and is familiar with seagoing vessels generally. The court thus has discretionary authority to give reasonably appropriate weight to his conclusions based on his mathematical calculations.

A key problem with Mr. Gouley's conclusions about the causes of Cape Fear's foundering, however, is that he made a significant mathematical error in determining how far the stern of the vessel lowered because of water in the hold, a finding that was central to his testimony. Mr. Gouley testified:

Q. So what you came here and testified to was a mathematical error of 12 times what would actually happen by your own calculations in using these graphs; isn't that correct, sir?

A. I wouldn't characterize it as a mathematical error. It was an error in units.

Q. Well, it provided information of 10.79 degrees, which was not accurate?

A. Correct.

Q. It would be less than 1 degree?

A. Correct

(Day Five, 75–76)

Mr. Gouley proceeded to explain why in his view this significant error would not

change his opinion. His inexperience with clamming vessels, however, gives the court pause in assigning weight to his conclusions without his first having performed and reported additional calculations and analysis that account for the error. The court has therefore given little weight to Mr. Gouley's conclusions as to the cause of the foundering of the vessel. The court need not have the benefit of Mr. Gouley's testimony, however, because the court finds obvious deficiencies in the seaworthiness of the vessel that developed during the last voyage and are discussed below.

## IX. The Exoneration Proceedings

### A. *Introduction*

On June 17, 1999, Petitioner Cape Fear, Inc., owner of the vessel, filed this petition for exoneration from or limitation of liability. *See* Docket No. 1. The two surviving crew members other than the captain have entered into settlement agreements with the petitioner and are not parties to this civil action. The captain has not filed a claim and is not a party to this civil action. The attorneys for claimants have filed claims (and thus these claimants are parties to this civil action) on behalf of survivors of the two deceased crew members.

On Monday, July 16, 2001, the court, sitting in admiralty, commenced trial solely on the petition for exoneration from or limitation of liability. After sessions on July 16–19, the court recessed the trial and reconvened on September 19, 2001. After sessions on September 19–20, the evidence was closed. The court heard oral arguments on November 29, 2001, and announced that an Opinion reciting findings of fact, conclusions of law, and rulings would be issued promptly. This is the court's Opinion.

### B. *Issues Regarding Alleged Unseaworthiness of the Vessel*

■ Wright, Miller, and Marcus call attention to the requirements that the com-

plaint in a proceeding such as this civil action set forth "the facts on the basis of which the right to limit liability is asserted, and all facts necessary to enable the court to determine the amount to which the owner's liability shall be limited," and in a footnote citing a decision of a United States district court, say:

> Limitation will be denied if the petitioner is unable to sustain the allegations of the complaint as to seaworthiness of the vessel and that the owner was free of privity or knowledge. *In re Parham,* D.C.Ark.1971, 336 F.Supp. 748.

12 Wright, Miller, and Marcus, *Federal Practice and Procedure* Civil § 3252, n. 6 (1997). After considering all of the submissions and arguments of parties to this civil action, I conclude that the quoted proposition is a correct statement of a rule of law applicable to the present case.

On the findings stated on the record on the last day of the trial, and additional findings stated below in this Opinion, I have determined that petitioner failed to sustain its claim for exoneration or limitation.

■ I have also concluded, however, that it is nevertheless necessary and appropriate for the court to make provisional rulings for allocation of shares of entitlement to assets of the petitioner that may be reached for satisfaction of claims against the F/V Cape Fear and its owner. In part this conclusion derives from the obligations of the court, when sitting in admiralty, to be sensitive to its responsibilities to seamen as wards of admiralty, and its responsibilities to survivors of deceased seamen. In this respect, a close analogy exists between the present case and *In re Complaint of Uncle Sam of '76, Inc.,* late owner of the F/V Italian Gold, for exonera-

tion from and limitation of liability, 928 F.Supp. 64 (D.Mass.1996).

A central tenet of admiralty jurisprudence is that seamen are wards of admiralty. *Robertson v. Baldwin,* 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715 (1897). The concerns of admiralty for protection of its wards extends also to protecting the legal rights of a seaman's survivors and dependents when the seaman is lost at sea. Thus, a district court sitting in admiralty has discretion at least, if not an obligation, to take reasonable steps to ensure that the survivors and dependents of a seaman lost at sea receive a fair share of limited settlement funds available to provide support for many claimants.

*Id.* at 66.

A risk exists that unless this court makes rulings now to avoid such an outcome, one or more of the survivors whose claims have not yet been resolved will receive more than a fair allocation, and one or more others will receive less, because of a race to judgment on separately tried survivors' claims. This is a somewhat different risk, but nevertheless analogous to the risks that existed in the proceedings following sinking of the Italian Gold. I therefore conclude that a need exists in this case for some form or analogous provisional allocation, because the court cannot now determine finally what sharing of rights in assets insufficient to satisfy all claims in full may be necessary and appropriate.

Support for a court's proceeding in this manner appears in two branches of precedent. These two branches bear upon historical sources of jurisdiction and authority of United States District Courts in equity and admiralty, respectively. Equitable proration of limited funds was applied early in the 20th century in the surety-bond context. *See,*

*e.g., Guffanti v. National Surety Co.,* 196 N.Y. 452, 90 N.E. 174 (1909). Later developments, after liability insurance had become more pervasive and problems of preferential settlement among claimants to limited coverage increased, involved proration of potential liability insurance benefits. In some jurisdictions, problems associated with risks of preferential settlement were addressed by using some form of proration, rather than a "first come, first served" rule, which would have recognized priority among claimants in the order in which they reduced their claims to judgment. *See, e.g., Moore v. McDowell,* 54 Mich. App. 657, 221 N.W.2d 446 (1974) (equitable principles motivated a pro rata distribution of funds deposited in court by a liability insurer despite the status of some claimants as judgment creditors); *Burchfield v. Bevans,* 242 F.2d 239 (10th Cir.1957). For a collection of authorities and a more extended development of arguments regarding principles of allocation, *see* Robert E. Keeton and Alan I. Widiss, *Insurance Law* §§ 7.4(d)-(f) (1988).

*Id.* at 65–66.

The methodology employed in arriving at these presumptive findings, as explained in this Opinion, is designed to yield a distribution very close to the distribution that would be likely to result from a full evidentiary hearing. The court finds by a preponderance of the evidence that no claimant or set of claimants would receive more money from an allocation based on shares determined after a full evidentiary hearing than that claimant or set of claimants will receive from the settlement fund if the distribution is made on the basis of these presumptive findings. These presumptive findings include findings as to all potential elements of recoverable

damages, including conscious pain and suffering of decedents, and pecuniary losses of all survivors.

*Id.* at 66.

These presumptive allocations will, of course, have to be subject to reconsideration after further proceedings in this or other tribunals provide a better basis for final allocations than is now available. If any claimant reaches a provisional settlement with petitioner, the interested parties may present a request to this court for permission to consummate that settlement, after a Case Management Conference in which all interested parties may be heard.

## C. *Findings on Unseaworthiness*

■ A vessel and its owners must show not only that the vessel was seaworthy at the commencement of the voyage but also that they maintained seaworthiness throughout the duration of the voyage. *See Mitchell v. Trawler Racer*, 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Ferrara v. A. & V. Fishing, Inc.*, 99 F.3d 449, 451 (1st Cir.1996) ("It is important to recognize that unseaworthiness may arise after the ship has left harbor.") The seaworthiness of a vessel has long included the capacity of the ship to carry the intended cargo. In Benedict on Admiralty, under judicial definitions of seaworthiness, it states:

In the Southwark, the Supreme Court approved this definition of seaworthiness:

"Bouvier's Law Dictionary defines 'seaworthiness' to be: 'In maritime law, the sufficiency of the vessel in materials, construction, equipment, officers, men and outfit for the trade or service in which it is employed' .... In the *Case of The Silvia*, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241, Mr. Justice Grady said: 'The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport'. This is the commonly accepted definition of seaworthiness. As seaworthiness depends not only upon the vessel being staunch and fit to meet the perils of the sea, but upon its character in reference to the particular cargo to be transported, it follows that a vessel must be able to transport the cargo which it is held out as fit to carry or it is not seaworthy in that respect."

Benedict on Admiralty, Volume 2A, § 61.

Benedict on Admiralty goes on to state that, "[s]eaworthiness requires that a vessel be safely loaded and properly stowed. If a vessel is loaded so heavily that she cannot safely sail on the voyage contracted for, she is unseaworthy." *Id.*, § 67.

In this case the claimants assert that the vessel was unseaworthy at the commencement of the voyage and became more so as conditions of the vessel and the seas developed during the latter stages of taking clams aboard.

■ For reasons stated below, I find it unnecessary and inappropriate to decide disputes about seaworthiness at commencement of the voyage. To resolve those disputes I would have to make predictions about the appropriate decisions on legal issues not yet determined by statutes and precedents. Rather than attempting to decide these issues of first impression, I turn to more easily decided mixed-law-fact-evaluative issues regarding seaworthiness at the time the captain and crew had completed taking clams aboard and began the return to port.

I find that as the captain started the return to port the F/V Cape Fear was unseaworthy because substantially overloaded with clams in cages, a practice that had become common on the F/V Cape Fear. A significant portion of the cages of clams were stacked on deck so as to place the center of gravity of the loaded vessel higher than was safe. At that time the sea had already become rough in weather that predictably would produce rougher seas en route to port. These conditions made it

highly likely that the F/V Cape Fear would sink and that before settling to the bottom it would roll, creating a very high risk not only of loss of the vessel and cargo but as well loss of life of one or more persons among the captain and crew.

Although the court makes no findings regarding whether the vessel was seaworthy when it left port, certain problems with the aft hold cover and the Cape Fear's emergency equipment also contributed to the likelihood of a disaster, especially considering the amount of clams loaded aboard the vessel. The opening in the aft hatch permitted water to enter the Cape Fear's hold much more easily than if it had been shut. Taking into account also that the Cape Fear was overloaded and being operated in terrible weather, I find that this hole in the aft section of the boat also contributed to the lack of seaworthiness of this vessel. Moreover, I find that problems with the working of the emergency gear increased the possibility of death of any who fell into the water during the storm. Although my finding of lack of seaworthiness of the F/V Cape Fear is not dependent on the deficiencies with the emergency gear or the opening in the aft hatch, I find that these factors did contribute to making the ship unseaworthy, when it started the homeward bound journey, to a greater extent than it otherwise would have been at that time.

## X. Other Matters

The court will not decide issues of negligence and contribution at this time. "The owner's duty to furnish a seaworthy ship is absolute," and thus does not require a finding of fault. *Mitchell*, 362 U.S. at 548–49, 80 S.Ct. 926; *see Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 7 (1st Cir.2001) ("A warranty of seaworthiness is an absolute duty owed by a ship owner to its crew...."). As the court has already determined that a breach of the duty of seaworthiness occurred, the court need not determine issues of alleged fault.

The court will proceed to deal with issues involving the availability of insurance proceeds and the allocation of compensation to claimants. The parties are given until January 18, 2002, to file briefs regarding these issues with the court. The court also sets a hearing on these matters for **February 5, 2002 at 3:00 p.m.**

### ORDER

For the reasons stated in the foregoing Opinion, it is ORDERED:

(1) Cape Fear's Petition for Exoneration is DENIED.

(2) Parties have until January 10, 2001 to file briefs regarding allocation of compensation to claimants and the availability of insurance proceeds.

(3) A **hearing** is set for **3:00 p.m. on February 5, 2002**, at which parties may present evidence and make oral arguments regarding the allocation of compensation to claimants and the availability of insurance proceeds.